Michael Wayne **RICHARD**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 69896.

Court of Criminal Appeals of Texas, En Banc.

Sept. 16, 1992.

Rehearing Denied Dec. 9, 1992.

**280**

Bob Wicoff (on appeal only), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Lester Blizzard and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of the offense of murder in the course of committing burglary, a capital offense under V.T.C.A. Penal Code, § 19.03(a)(2). The jury answered special issues affirmatively, Article 37.-071(b), V.A.C.C.P., and punishment was assessed accordingly at death. Appeal to this Court is automatic. *Id.*, § h.

On the night of August 18, 1986, Marguerite Lucille Dixon was found dead on her bed by two of her children, the victim of a single .25 caliber gunshot wound to the head. Several television sets had been taken from the house, and her son's van was missing from the driveway. There is evidence she had been sexually assaulted. Appellant does not contest the sufficiency of the evidence to establish he committed the offense.

In his seventh point of error appellant contends the trial court erred in not providing the jury at the punishment phase of trial with some instructional vehicle for exercising its "reasoned moral response" to evidence having mitigating significance beyond the scope of Article 37.071(b) special issues. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). He contends the jury had no mechanism to respond to the full mitigating impact of evidence of his low intelligence and his antisocial personality disorder brought about by extreme childhood abuse. Appellant requested no such instruction at trial.[1]

1. Appellant did ask for, and received, an instruction in the following tenor:

"You are further instructed that *in determining each of these Special Issues, you may take into consideration* all of the evidence submitted to you in the full trial of the case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the Defendant, and all of the evidence, including *evidence offered in mitigation of punishment,* if any, admitted before you in the second part of the trial wherein

you are called upon to determine the answers to Special Issues hereby submitted to you." Of course, an instruction telling the jury it may utilize evidence for whatever mitigating value it may have *relevant* to the special issues is not a *Penry* instruction at all. *James v. State,* 805 S.W.2d 415, at 417, n. 3 (Tex.Cr.App.1990). Indeed, such an instruction need not have been given in this case, even upon request. *Quinones v. State,* 592 S.W.2d 933, at 947 (Tex.Cr.App. 1980). An instruction empowering the jury to impose a sentence less than death on the basis of evidence having mitigating value *beyond* its

However, he was tried in August of 1987, two years before the opinion of the United States Supreme Court in *Penry* was delivered. This Court has held that under these circumstances *Penry* error need not be raised in the trial court in order to be preserved for appeal. *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991) (Campbell, J., concurring, joined by five other judges); *Selvage v. Collins,* 816 S.W.2d 390 (Tex.Cr. App.1991) (Opinion on Certified Question from the United States Court of Appeals for the Fifth Circuit). We will therefore reach the merits of his contention.

■ At the guilt/innocence phase of trial Dr. Jerome Brown, a clinical psychologist, testified that in testing, appellant proved to have "an IQ score of 62, which places him in the upper limits of the mentally defective range." He explained that "[a]n IQ below 69 or 70 is obtained only by about three percent of the population and is considered quite low." At one point Dr. Brown agreed appellant belonged in the category of "educable mentally retarded." On crossexamination he described appellant as "slow" but not "retarded"—at least "[n]ot in the way that most people think of retarded people, no." [2]

■ At the punishment phase of trial appellant presented testimony from his mother and one of his three sisters. Their testimony establishes an extensive history of physical and emotional abuse at the hands of appellant's father. When appellant was a child his father worked as a "long-haul truck driver," transporting grain and livestock. Consequently he "stay[ed] up a lot on alcohol and drugs," *viz:* amphetamines. Appellant's father drank "every day," and when drinking, he was violent and quick to anger over trivial matters. Appellant's mother was sent to the hospital an unspecified number of occasions with broken ribs, a broken nose, broken foot and lumps on her head, one where appellant's father had struck her with a .38 caliber pistol. She cataloged her many scars for the jury. Appellant, the youngest child, was his mother's favorite, and drew his father's ire for that reason. His father called him a "punk," and accused him of having sexual relations with his mother even as a child. When appellant would try to protect his mother, he suffered beatings for his troubles. The authorities would not intervene, considering the situation to be a "domestic disturbance."

At times appellant's father would openly co-habitate with other women, to the shame of his children. Other times he kicked his wife and children out of the house, forcing them to stay with appellant's aunt. Appellant's mother suffered a nervous breakdown when appellant was four or five years old, and was hospitalized for three months. Since that time she has been under psychiatric care, suffering from anxiety and depression.

All of the children were beaten from about the age of eight years old. Appellant's father used bull whips, cattle prods and leather belts. Appellant was beaten once with "a hanger." Appellant reportedly never cried out during these beatings. His father sexually abused each of his sisters from the age of puberty on. Once he fired a shotgun at one of appellant's sisters when she refused his advances. Appellant was aware of these abuses. He left home for good at fourteen when "[h]is daddy had whopped him with a lead rope and he said he wasn't going to see that anymore." All

relevance to the special issues, as per *Penry,* was neither requested nor submitted here.

**2.** Dr. Brown is the same psychologist who testified at the competency hearing in *Penry. Id.,* 492 U.S. at 307–308, 109 S.Ct. at 2941, 106 L.Ed.2d at 271. Here, he testified at guilt/innocence pursuant to appellant's strategy to persuade the jury that a statement he gave to police was not knowing and voluntary due to appellant's inability to comprehend statutory and constitutional warnings. This circumstance does not detract from the mitigating significance of Dr. Brown's testimony as it relates to the punishment phase. "Whether evidence has 'mitigating value' is not determined by the party who offers it, the time of admission, or its manner of admission (direct or crossexamination) into evidence during a trial. The question is merely whether this evidence was before the jury for its consideration." *Ex parte Ellis,* 810 S.W.2d 208, at 211 (Tex.Cr.App.1991).

of his siblings had run away by the age of fifteen. Appellant's brother is an unemployed alcoholic. Two of his sisters are under psychiatric care.

Appellant was a premature baby, and spent the first month of his life in the hospital. When he was finally released "he still was sick and we had to put him in the hospital practically every year until he got 6 years." He had asthma and was allergic to milk. In school appellant was "slow," earning D's and F's. He did not make it past the ninth grade, and reads without comprehension. His father taught him to steal, directing him to take livestock from rodeos. Not surprisingly, appellant developed into an angry adolescent with a bad temper.

Dr. Fred Fason, a psychiatrist, testified that he had examined appellant, and diagnosed him to be a "sociopathic personality, antisocial type." Dr. Fason elaborated on this condition, *viz:*

"... I think the best thought today and the thought that I would be most in agreement with would be that these are individuals who are very narcissistic or self-centered individuals and by that I mean they have big egos, so to speak, in lay terminology. They feel entitled to whatever it is that they want.

"Gratitude is not an emotion that is very consistent with sociopathic personality or antisocial reactions. They tend to be manipulative, they tend not to have their behavior much influenced by guilt or by shame and at times not even influenced very much with consequences of the behavior. They are notoriously self-defeating in the pattern of their lives.

\*     \*     \*     \*     \*     \*

"In this narcissistic development can be either primary narcissism, which is kind of where all of us are when we are babies. We feel like we're kind of the center of the world and entitled to what we get. Most of us around the age of 2 and a half or 3 discover that our mothers take care of us because they love us, not because they have to and we make a transition from seeing ourselves as a center of the earth to viewing ourselves as dependent upon our parents for loving and caring and attention.

"The sociopathic personality either, or the narcissistic individual, either does not make this transition of from primary narcissism to relating to others with love and what's called primary narcissism. If a person never made the transition or at times they will make the transition and they will experience love and gratitude and later trauma in their lives of one sort or another will cause them to regress back to this primitive narcissistic position where they consider what they want and their egos to be the most important things in the world and that they are entitled to what they want.

\*     \*     \*     \*     \*     \*

"Now, in normal development we make a transition from relating to the world from the point of view of the narcissistic way of relating to the world, to psychoanalytic language of relations or love relations with others.

"Now, the sociopath either has difficulties, if it's a primary narcissistic disorder that underlays it, has never made this transition of learning to consider other people as being like himself or looking at the world through other people's eyes; if he has made the transition, then there is later trauma that has occurred of a variety of sorts that causes him to regress back to that narcissistic phase of development.

\*     \*     \*     \*     \*     \*

"... At an early age the essential ingredient that is added to the narcissism of the sociopath is an attitude of saying to themselves ... 'Fuck it. I don't care,' they say to themselves.

\*     \*     \*     \*     \*     \*

"After awhile the process becomes unconscious and they don't even think anymore about the consequences or they don't even think about how it affects people or what it says about them. They just react and this is the impulsivity of the sociopath and that's why they are in trouble with the law and everything else."

Dr. Fason further testified that physical abuse was one of many possible triggering mechanisms for what he later termed "secondary narcissistic disturbance," this regression back to the narcissistic phase brought on by trauma. Through a series of hypothetical questions counsel for appellant established that many of the circumstances of appellant's brutalized past were either contributory to or indicative of this kind of sociopathic personality.[3]

Moreover, Fason continued, appellant's IQ, as determined by Dr. Brown, represents "an intellectual age of about 8." Most people in appellant's IQ range come to depend upon someone of average intelligence, a friend or parent, to help them cope; a "mentor" "that kind of functions as an auxillary [sic] intelligence for them." A sociopathic personality, however, is not likely to develop such a relationship.[4]

These mitigating facts are quite similar to those detailed in *Ramirez v. State*, 815 S.W.2d 636, at 655 (Tex.Cr.App.1991), wherein the Court reversed the conviction for failure of the trial court *sua sponte* to give a *Penry* instruction. Like Ramirez, appellant tested in the "mentally defective" range. See also *Ex parte Goodman*, 816 S.W.2d 383 (Tex.Cr.App.1991); *Ex parte McGee*, 817 S.W.2d 77 (Tex.Cr.App.1991); *Ex parte Williams*, 833 S.W.2d 150 (Tex. Cr.App.1992). And appellant suffered the same variety of family abuse as Ramirez, only worse.

Recent decisions from this Court have required as a condition of reversal on the basis of *Penry* error "some testimony indicating a nexus between [the accused's] childhood circumstances and the commission of the crime ... indicative of a lessened moral blame-worthiness." *Nobles v. State*, 843 S.W.2d 503, 506 (Tex.Cr.App. 1992). See also *Goss v. State*, 826 S.W.2d 162 (Tex.Cr.App.1992) (Plurality opinion); *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr. App.1991) (Opinion on appellant's motion

for rehearing). Cf. *Draughon v. State*, 831 S.W.2d 331, at 339 (Tex.Cr.App.1992) (where appellant's mother and sister were physically abused by his step-father, but appellant himself was not, "we are not persuaded that any substantial portion of society shares a belief in the reduced culpability of persons disadvantaged in the way he describes."). The instant record contains evidence from which a rational jury could infer that appellant's conduct in this cause was "attributable to" his sociopathic personality disorder, which in turn was brought on by trauma emanating from his "disadvantaged background." *Penry v. Lynaugh*, supra, 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278, quoting *California v. Brown*, 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring). We hold that this evidence provides a sufficient "nexus between [appellant's] childhood circumstances and the commission of the crime." *Nobles v. State*, supra. In any event, since *Nobles* was decided the Court has still not required an express showing of "nexus" between evidence of mental defectiveness and the offense on trial. *Ex parte Williams*, supra. We conclude that appellant presented evidence that "has a tendency to reduce his moral culpability in a way not exclusively related to the deliberateness of his criminal conduct, the provocative behavior of his victim, or the probability of his future dangerousness[.]" *Gribble v. State*, 808 S.W.2d 65, at 75 (Tex.Cr. App.1990). On authority of *Ramirez* and *Williams*, both supra, we hold that appellant was entitled to a jury instruction authorizing the jury to impose a sentence less than death on the basis of this evidence.

■ In his fifth point of error appellant contends the evidence does not support the jury's affirmative finding to the second special issue, *viz:* "whether there is a probability that the defendant would commit

---

3. Asked on crossexamination whether he could say whether appellant's sociopathic personality was of the primary or secondary narcissism type, Dr. Fason replied he did not have sufficient data, but his "hunch" is appellant's is of the latter.

4. There was no testimony regarding the synergistic effect, if any, between appellant's mental defectiveness and his sociopathic personality disorder.

criminal acts of violence that would constitute a continuing threat to society." Article 37.071(b)(2), supra. The State introduced two pen packets at the punishment phase of trial, reflecting convictions for burglary of a habitation in 1977 and 1978, and, in 1985, two convictions for felony theft and one for forgery. It was shown by testimony that appellant took, *inter alia,* some ten assorted firearms from the residences he broke into in 1977 and 1978. One of the 1985 felony thefts involved breaking into a residence as well, during which appellant took a pistol. We have observed that "though burglary is not *necessarily* a violent crime against a person, it is certainly pregnant with that potential;" that it may be a "harbinger" of future violence. *King v. State,* 631 S.W.2d 486, at 503 (Tex.Cr.App.1982) (emphasis in the original). In the instant offense the evidence shows appellant shot his victim in the temple at point blank range in the course of yet another burglary. All of this demonstrates a propensity to commit potentially violent crimes and a readiness to use lethal force in the process. Especially in combination with Dr. Fason's "double-edged" diagnosis of appellant as a sociopathic personality, see *ante,* this evidence provided the jury with a rational basis to answer the second special issue "yes." *Burns v. State,* 761 S.W.2d 353 (Tex.Cr.App.1988). Appellant's fifth point of error is overruled.

■ Because the charge at punishment did not authorize the jury to impose a sentence less than death on the basis of evidence presented that had mitigating significance beyond the scope of the Article 37.071(b) special issues, appellant's death sentence violates the Eighth Amendment. *Penry v. Lynaugh,* supra. Accordingly, the judgment of the trial court is reversed and the cause is remanded for new trial.[5]

5. The Legislature amended Article 44.29(c) in 1991 to provide that error committed only in the punishment phase of a capital murder prosecution will not result in a *whole* new trial, as before, but only in a new punishment proceeding. See Acts 1991, 72nd Leg., ch. 838, p. 2900,

McCORMICK and WHITE, JJ., concur.

OVERSTREET, J., not participating.

§ 1, eff. Sept. 1, 1991. However, the Legislature expressly made this amendment prospective only. *Id.,* § 5. For this reason we need not address points of error alleging trial error in the guilt/innocence phase of trial.