**Ex parte Henry Lee LUCAS.**

No. 71164.

Court of Criminal Appeals of Texas,
En Banc.

June 8, 1994.

Danny D. Burns and Richard Alley, Fort Worth, for appellant.

Ken Anderson, Dist. Atty., and Paul Womack, Asst. Dist. Atty., Georgetown, Robert Huttash, State's Atty., Austin, for State.

Before the court en banc.

## OPINION ON REMAND FROM THE UNITED STATES SUPREME COURT

CAMPBELL, Judge.

Applicant Henry Lee Lucas was convicted of capital murder and sentenced to death for the murder and sexual assault of an unidentified woman in Williamson County. On direct appeal to this Court, we affirmed. *Lucas v. State,* 791 S.W.2d 35 (Tex.Crim.App.1989). Applicant then filed a post-conviction application for writ of habeas corpus. We denied relief. *Ex Parte Lucas,* 834 S.W.2d 339 (Tex.Crim.App.1992). The United States Supreme Court subsequently granted applicant's petition for writ of certiorari, vacated our judgment, and remanded this case for further consideration in light of *Johnson v. Texas,* —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). We will again deny relief.

In *Johnson,* the petitioner, Dorsie Lee Johnson, was found guilty of capital murder and sentenced to death. At the punishment phase of Johnson's trial, the jury was instructed on special issues one and two.[1] On appeal, Johnson argued that, under the Eighth Amendment, the trial court should have allowed a special jury instruction at the punishment phase concerning the potentially mitigating evidence of his youth. The Supreme Court held that the trial court's refusal to allow the special instruction did not offend the Eighth Amendment's prohibition against cruel and unusual punishments.

The Supreme Court's *Johnson* decision succeeded its earlier decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In *Penry,* the petitioner, Johnny Paul Penry, provided evidence during his capital murder trial of his mental retardation and abusive childhood. The Court held that the special issues under the Texas capital sentencing scheme were insufficient, without an additional jury instruction, to allow the jury to give effect to the relevant mitigating evidence offered by Penry at his

---

1. At the time of Johnson's trial, Article 37.071(b) of the Texas Code of Criminal Procedure provided for a jury to consider the following special issues in determining whether to assess the death penalty in a capital case:

    (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

    (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

    (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

trial. The Court held, specifically, that, without an additional jury instruction, the jury in Penry's case was unable to make a "reasoned moral response" to Penry's mitigating evidence in deciding whether to impose the death penalty.

Applicant introduced "mitigating" evidence at his trial in the form of testimony from a psychologist and a psychiatrist. The psychologist, Dr. Tom Kubiszyn, testified that applicant suffered from "chronic schizophrenia of a residual type with an underlying schizotypal personality disorder." Dr. Kubiszyn also testified concerning applicant's childhood, stating that applicant's father was a bootlegger and a double amputee who died when applicant was still young, and that applicant's mother was sexually promiscuous and inflicted physical and emotional abuse upon applicant. Dr. Kubiszyn stated that he believed the abuse inflicted upon applicant by his mother caused applicant, as an adult, to harbor strong feelings of resentment and hostility toward females. Finally, Dr. Kubiszyn testified that applicant was of "low-average" intelligence, with an I.Q. of 84.

The psychiatrist, Dr. Jay Fogelman, corroborated much of Dr. Kubiszyn's testimony concerning applicant's psychosis and childhood. Dr. Fogelman testified that applicant suffered from "chronic schizophrenia," and had two personality disorders—a schizotypal personality and elements of a sociopathic personality. Dr. Fogelman also testified that, as a child, applicant frequently witnessed his mother undress and act provocatively in his presence, and that applicant periodically had seizures at school which caused him to be treated as an outcast.

In our initial review of this post-conviction application for relief, we held that the potentially mitigating evidence offered by applicant did not warrant a *Penry*-type instruction at the punishment stage of his trial. *Ex Parte Lucas*, 834 S.W.2d at 342. We do not believe that *Johnson* changes that holding. The record shows that applicant was 43 years old when he committed the instant offense. The petitioner in *Johnson*, in contrast, was only 19 when he committed his offense. We believe, therefore, that youth is not a factor in the instant case.

Given the facts and holding of *Johnson,* we conclude that our original determination, that applicant's potentially mitigating evidence did not merit an additional jury instruction at the punishment phase of his trial, is unaffected by *Johnson.* Therefore, we reaffirm our holding in our initial review of applicant's post-conviction application for relief.

The request for relief is DENIED.

CLINTON, BAIRD and OVERSTREET, JJ., dissent because the majority pretends the Supreme Court remanded this cause to reconsider the matter of age, all the while ignoring that it pointedly cautioned, "*Penry* remains the law and must be given a fair reading." 509 U.S. at ——, 113 S.Ct. at 2670, 125 L.Ed.2d at 307.

MALONEY, J., not participating.

OVERSTREET, Judge, dissenting.

This is a post-conviction application for writ of habeas corpus filed pursuant to the provisions of Article 11.07, V.A.C.C.P. In April of 1984, applicant was convicted of capital murder, alleged to have been committed on or about October 31, 1979. He was sentenced to death. This Court affirmed the judgment and sentence on direct appeal. *Lucas v. State,* 791 S.W.2d 35 (Tex.Cr.App. 1989). Applicant thereafter presented five allegations in which he challenged the validity of his conviction and resulting sentence. On November 29, 1990 this Court ordered the instant cause filed and set for submission on one of those allegations. On April 8, 1992 we denied applicant's application for writ of habeas corpus. *Ex parte Lucas,* 834 S.W.2d 339 (Tex.Cr.App.1992). Applicant thereafter petitioned the United States Supreme Court for writ of certiorari. On June 28, 1993 the Supreme Court granted such and ordered our judgment vacated and remanded the cause to us "for further consideration in light of *Johnson v. Texas,* 509 U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)." *Lucas v. Texas,* —— U.S. ——, 113 S.Ct. 3029, 125 L.Ed.2d 717 (1993).

In *Ex parte Lucas, supra,* this Court concluded that the jury was able to consider and give effect to appellant's evidence of his mental disease/defect and distressed childhood by

way of answering the special issues which were submitted per Article 37.071, V.A.C.C.P. Pursuant to the Supreme Court's instructions, this Court must reconsider its conclusion "in light of *Johnson v. Texas*, 509 U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)." We should therefore very closely examine *Johnson.*

## I.

## HOLDING OF *JOHNSON*

*Johnson v. State,* 509 U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) involved a Texas capital murder defendant who claimed that the Texas special issues did not allow his jury to give adequate mitigating effect to evidence of his youth, i.e. being 19 years of age at the time of the offense. After discussing the development of recent constitutional jurisprudence regarding the consideration of mitigating circumstances by sentencers in capital cases, including the principle that "[a] sentencer ... must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence[,]" the Supreme Court determined that "there [wa]s no reasonable likelihood that the jury would have found itself foreclosed from considering the relevant aspects of [Johnson's] youth." *Id.,* 509 U.S. at ——, 113 S.Ct. at 2669, 125 L.Ed.2d at 306. It "believe[d] that there [wa]s ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination." *Id.* It concluded that "[t]here was no constitutional infirmity" in the application of the special issues. *Id.,* 509 U.S. at ——, 113 S.Ct. at 2672, 125 L.Ed.2d at 310.

## II.

## ANALYSIS

While the defendant in *Johnson* was 19 years of age at the time of the commission of his offense, the record indicates that applicant was substantially older at the time of the commission of the instant offense; specif-

ically applicant's confession indicates that he was age 46 in June of 1983, thus making him approximately 42 in October of 1979 at the time of the offense in the instant cause.[1] Thus it can hardly be said that their ages were comparable or analogous. However, since the Supreme Court remanded this cause "for further consideration in light of *Johnson* ...[,]" there must be something within *Johnson* aside from the age of the defendant which merits such "further consideration[.]"

*Johnson* compared *Penry* mitigation evidence, mental retardation which prevented learning from experience and from mistakes, with Johnson's youth. "That the jury had a meaningful basis to consider the relevant mitigating qualities of [Johnson's] youth is what distinguishes [*Johnson*] from *Penry.*" *Id.,* 509 U.S. at ——, 113 S.Ct. at 2669, 125 L.Ed.2d at 307. It concluded that youth falls outside *Penry*'s ambit, because the ill effects of youth are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue. *Id.,* 509 U.S. at ——, 113 S.Ct. at 2670, 125 L.Ed.2d at 307. "If any jurors believed that the transient qualities of [Johnson's] youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating [his] future dangerousness." *Id.*

Also, the Supreme Court stated that in *Johnson* the trial court submitted a jury charge instruction at punishment concerning the consideration of mitigating evidence, i.e. instructing the jury that it could take into consideration all of the evidence, whether aggravating or mitigating in nature, in answering the special issues. *Id.,* 509 U.S. at ——, ——, 113 S.Ct. at 2662, 2669, 125 L.Ed.2d at 297, 306. It also notes that the phrase "continuing threat to society" used in the second special issue "affords the jury room for independent judgment in reaching its decision." *Id.,* 509 U.S. at ——, 113 S.Ct. at 2670, 125 L.Ed.2d at 308. It concludes that consideration of the second special issue

---

1. Another confession, which was identified but not introduced into evidence, indicated that applicant was born on "08–23–36." There was

also testimony that applicant was a 46–year old at the time he was examined in June of 1983.

"is a comprehensive inquiry that is more than a question of historical fact." *Id.,* 509 U.S. at ——, 113 S.Ct. at 2671, 125 L.Ed.2d at 308.

The Supreme Court also pointed out that its capital punishment jurisprudence has not been construed to mean that a jury must be able to dispense mercy on the basis of a sympathetic response to the defendant. *Id.,* 509 U.S. at ——, 113 S.Ct. at 2671, 125 L.Ed.2d at 308. It rejected the proposition that a jury be able to give effect to mitigating evidence in every conceivable manner in which evidence might be relevant. *Id.,* 509 U.S. at ——, 113 S.Ct. at 2671, 125 L.Ed.2d at 309. It is appropriate for the State to structure the consideration of mitigating evidence via the special issues. *Id.,* 509 U.S. at ——, 113 S.Ct. at 2671–2672, 125 L.Ed.2d at 309–310.

The evidence in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) which was outside the scope of the special issues was mitigating evidence of mental retardation and childhood abuse. Such evidence was a two-edged sword, i.e. "it may diminish [Penry's] blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Id.,* 492 U.S. at 324, 109 S.Ct. at 2949, 106 L.Ed.2d at 281. The special issues regarding acting deliberately and unreasonably in response to provocation were also insufficient to allow the jurors to express a reasoned moral response to Penry's mitigating evidence. 492 U.S. at 322–324, 109 S.Ct. at 2948–2950, 106 L.Ed.2d at 280–282. Also noting the prosecutor's jury argument at punishment, which urged the jury to answer the special issues strictly in accordance with the evidence and without acting on emotions, and the absence of appropriate jury instructions, it concluded that "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.,* 492 U.S. at 326, 109 S.Ct. at 2951, 106 L.Ed.2d at 283. "[I]n the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused

background by declining to impose the death penalty, . . . the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.,* 492 U.S. at 328, 109 S.Ct. at 2952, 106 L.Ed.2d at 284.

Nevertheless, the Supreme Court recently stated that *Penry* was not read "as effecting a sea change" with respect to the constitutionality of the Texas death penalty statute nor does *Penry* broadly suggest the invalidity of the special issues framework. *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 901, 122 L.Ed.2d 260, 274 (1993). This view was duly noted in *Johnson, supra,* 509 U.S. at ——, 113 S.Ct. at 2668, 125 L.Ed.2d at 304–305. This Court has recently stated that "whether or not the protections of *Penry* are required at all depends on whether evidence was presented to the jury which was shown to have a tendency to reduce the moral culpability of the capital defendant in a way not exclusively related to the special issues." *Satterwhite v. State,* 858 S.W.2d 412, 426 (Tex.Cr.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993).

### III.

### APPLICANT'S EVIDENCE

In his brief after remand, applicant asserts that "the jury could not give mitigating effect to [his] two-edged evidence that he suffers from chronic schizophrenia in its answers to the . . . special issues" and that such "special issues did not allow the jury to give this evidence mitigating effect[.]" He insists that his condition "is the classic example of evidence which both militates for and against the death penalty without guiding jury instructions." He acknowledges that he "can, when the medication is properly monitored and given in proper dosage, be sedated to the point that he can function in society[,]" but argues that "[t]he jury could well have found that the mental condition was such to warrant mercy and yet found that because of the 'relapse' which caused him to have the medication altered and changed, that there was still a probability that he would commit acts of violence in the future." He insists that any "fair reading" of *Penry, Graham,* and *Johnson* "distills to an irreducible minimum:

evidence of a chronic mental impairment is two-edged and cannot be given mitigating effect under the restrictive scope of the former special issues." He maintains that while "[t]he evidence of [his] mental illness and defect of mind is overwhelming[, ...] the ability to use that mitigating factor to lessen his sentence in light of the special issues submitted is non-existent."

The State argues that applicant's evidence was such that he suffered from a treatable mental illness rather than the permanent mental retardation of *Penry*. It points out that applicant's psychosis could be controlled if treated with anti-psychotic drugs, which he had received while jailed. It insists that "[t]he difference between the permanence of mental retardation and the transience of youth was the linchpin of the Supreme Court's decision in *Johnson [supra]*." It concludes that "[t]h[e] mitigating evidence of mental illness could have been given effect within the terms of the second issue ... [and that] [i]f the jury believed, or had a reasonable doubt as to, the mitigating evidence that [applicant] suffered from a psychosis that was controllable by institutionalization and medication, they could have given effect to the evidence by answering the issue 'no.'"

Applicant's brief after remand also asserts that "the sickening circumstances of [his] youth[,]" specifically that "[h]is mother was a drunken prostitute who regularly plied her trade, with multiple partners, in front of [him] and [who] routinely beat [him][,]" left applicant "with de[e]p-seated hostilities and resentments toward women, and provided the fertile soil in which his schizophrenia developed and grew." However, he does not make an independent claim regarding his distressed childhood, but rather includes such as a part of his mental disease/defect claim. He cites expert testimony that his mental illness "probably developed from the traumatic circumstances of his early developmental history." He adds that he developed the personality disorder "in a home marked by physical and emotional abuse and sexually inappropriate behavior[,]" thus the personality disorder "is superimposed over a psyche irreparably scarred by his mother's behavior[.]" Thus it should be considered within that mental disease/defect claim.[2]

As we noted in *Ex parte Lucas*, 834 S.W.2d at 341, applicant at guilt/innocence presented to the jury expert testimony that he suffered from chronic schizophrenia and schizotypal personality disorder, a long-standing serious mental disease or defect, an antisocial personality plus schizophrenia, and that such was the most severe mental disease/defect that one could have. In a bit more detail, I observe that the record reflects the following testimony:

PSYCHOLOGIST proffered by applicant: Applicant has very strong feelings of inadequacy and inferiority, with very pervasive feelings of sadness, rejection, guilt, and a sense of inner turmoil. He also has tendencies suggesting some evasiveness and suspiciousness. He tends to misperceive aspects of reality, i.e. has difficulty comprehending completely either complex or lengthy verbal instructions or directions that are spoken to him that have complexity or length to it. There are gaps in his perception and ways of dealing with and viewing the world, with a distortion of reality taking place. He was aware that applicant had been taking Thorazine for several months, which was a drug effective in treating the schizophrenic individual in helping organize thinking and perceiving reality accurately. He stated that schizophrenia was a disease/disorder "that waxes and wanes" and that it was entirely possible that someone who suffers therefrom

---

2. I note that we have repeatedly rejected claims that evidence of a turbulent childhood and traumatic upbringing were comparable to *Penry* evidence and outside the scope of the special issues. *See, e.g., Gunter v. State,* 858 S.W.2d 430, 445–447 (Tex.Cr.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993); *Kemp v. State,* 846 S.W.2d 289, 309–310 (Tex.Cr. App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993); *Jacobs v. State,* 843 S.W.2d 517, 520 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993); *Nobles v. State,* 843 S.W.2d 503, 505–506 (Tex.Cr.App.1992); *Goss v. State,* 826 S.W.2d 162, 166–167 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex.Cr.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992).

"would be able to lead a relatively normal existence." While such individuals would typically have difficulty in social situations, during some of the less severe phases they would not exhibit speech-hallucinations-delusions or any of the other classical symptoms associated with an acute exacerbation. He stated that applicant "ought to be institutionalized and provided with the proper kind of care." He also opined that schizophrenia does not go away. He added that applicant's childhood of extreme emotional and economic deprivation and growing up in a household where there was no nurturance was important. He also opined that applicant would likely exhibit a passive aggressive response to an authority figure. He indicated that applicant had a longstanding serious mental disease or defect. He also said that "[a]ttaching a diagnosis like schizophrenia to an individual is the most severe kind of diagnosis you can attach and should be reserved only for those individuals who do clearly fit into that diagnostic category." Applicant's history of auditory and visual hallucinations was also important. He testified that while the disorder remains present chronically, it goes through waxing and waning periods where it becomes acute and settles down a bit, and that during the settled down periods such individuals can function and carry on basically normal daily tasks. Applicant's condition appeared to be relatively well controlled as a result of the anti-psychotic medications, thus he opined that applicant was at that point mildly schizophrenic. He stated, "Once an individual suffers from schizophrenia, there is virtually no chance that that individual will return to normal functioning." PSYCHIATRIST proffered by applicant: Applicant was chronic, meaning anything lasting over two years, schizophrenic. He also had schizotypal personality and elements of antisocial or sociopathic personalities. He indicated that schizophrenia was the most severe psychiatric illness that there is. A patient suffering from schizophrenia "cannot tell what's real from what's not real, and so they have a whole headful [sic] of very private thoughts and feelings that may not correlate at all with

what is in reality." He noted that applicant had so many symptoms that people with plain old personality disorders do not have, such as hallucinations, delusions, and the belief that he has the capacity for telepathy. He stated that schizophrenics absorb, almost like a sponge, large amounts of antipsychotic medication "because their brain needs that because there are chemical defects in schizophrenics, a genetic chemical illness." He also noted applicant's family history being positive for what sounded like schizophrenia. He said that neurotransmitters, little molecules in the brain that help transmit feelings, thoughts, and behaviors, are present way in excess in schizophrenics. He also stated that schizophrenics' CAT scans of the brain have all kinds of irregularities, and that spinal fluid studies demonstrate abnormal findings. However, he had not conducted such tests on applicant.

He opined that a schizophrenic is born with a gene with chromosomes that unfold and display schizophrenic symptoms; thus being "a victim of that just like you are a victim of the color of eyes that you have or the color of skin or texture of your hair." He stated that some schizophrenics are so impaired that they are catatonic, i.e. they stay motionless, while others are ambulatory, i.e. able to function and work, though not perfectly normally. He also talked about how Thorazine worked in blocking the excess level of molecules. He added that schizophrenia is "the most severe mental disease/defect that you can have." He indicated that applicant's childhood background was important. He also noted applicant's having been diagnosed as autistic. He also talked about the four A's of schizophrenia: ambivalence, autistic thought, strange associations, and inappropriate affect. He was of the opinion that applicant "float[ed] in and out of a psychotic state." He stated, "From my own interviews [applicant] has virtually every symptom of schizophrenia." He also described questions and answers which indicated that applicant was not malingering. He also noted that it is debatable about whether if a person is truly schizophrenic they would be so all of their life, and mentioned a

book, *I Never Promised You A Rose Garden,* about a woman whose schizophrenia apparently somehow magically went away; though he himself had never seen a chronic schizophrenic that just had a sudden cure.

He added that applicant also had antisocial/sociopathic personalities. He also stated that applicant was born with a gene that causes him to have episodes of psychosis, and noted that "[applicant] was not asked to be born with that gene." He compared that to diabetics and patients with leukemia who do not ask to be born with such genes. He opined that the sociopathic antisocial part of applicant's personality was "just a small drop in the bucket compared with th[e] schizophrenic, th[e] psychosis that takes over and determines to him how to behave." He added, "In other words, [applicant] is the slave to his schizophrenia." He also suggested that applicant "be put in, like, a hospital for the criminally insane, locked up forever, treated with strong medication like Thorazine, lots of doctoring." He opined that applicant was never going to be in any kind of position to be released, i.e. he "need[ed] to be locked up in a psychiatric hospital with maximum security forever."

It is undisputed that applicant presented a great deal of evidence that he suffered from schizophrenia and the effects thereof. The State's brief after remand suggests that "[his] evidence of treatable mental illness was rejected as mitigation at the punishment stage ... not because it was outside the scope of the issues, but because it was not believed." Whether it was believed or not, this Court must determine whether such evidence was or was not able to be sufficiently considered and acted upon within the scope of the special issues.

## IV.

## APPLICATION TO APPLICANT

As noted above there was a great deal of evidence about schizophrenia. This included testimony indicating that it was effectively permanent, yet somewhat controllable via medication. Applicant's evidence did indicate that schizophrenia would not go away

and was not such that it would be grown out of as is the case with youth (although it is certainly arguable that some people do not necessarily grow out of the qualities of youth, i.e. remain "young at heart" and engage in youthful behavior throughout life). However, the testimony indicated that the ill effects of schizophrenia are subject to some change via medication and institutionalization with proper care. Yet I agree with applicant that there is a distinction between a transient condition of youth and the potentially treatable chronic schizophrenia.

I observe that applicant's evidence does not indicate that his mental disease/defect prevented him from learning from mistakes or experience. In fact, as we noted in *Ex parte Lucas,* 834 S.W.2d at 341, there was testimony that his intellectual functioning was in the low-average or low-normal range with an IQ score of 84. Thus in that manner it differs from *Penry.*

The punishment jury charge included the special issues that were provided for by Article 37.071(b)(1)(2), V.A.C.C.P., regarding whether applicant's conduct was committed deliberately and with reasonable expectation that the death of the deceased would result, and whether there was a probability that applicant would commit criminal acts of violence that would constitute a continuing threat to society. It also included the following instruction:

> You are further instructed that in determining each of these issues you may take into consideration all of the evidence submitted to you in the full trial of this case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence admitted before you in the second part of the trial wherein you were called upon to determine the answers to the issues hereby submitted to you.

This instruction is somewhat similar to the one quoted in *Johnson, supra,* 509 U.S. at ——, 113 S.Ct. at 2662, 125 L.Ed.2d at 297. However, the instruction in the instant cause did not include the denoting phrase "whether aggravating or mitigating in nature" as did

*Johnson*'s. It is also very similar to the instruction which was submitted in *Richard v. State,* 842 S.W.2d 279 (Tex.Cr.App.1992), which we held to have been inadequate to provide a sufficient vehicle for the jury to express its reasoned moral response to *Penry* evidence. Nevertheless, applicant's jury was instructed that it could consider the evidence which had been introduced at guilt/innocence, which included the above-discussed evidence of mental disease/defect.

My review of the punishment jury arguments reveals that the State's opening pointed out some of applicant's proffered expert testimony that had indicated that he was dangerous and needed to be locked away for the rest of his life. However, it focused its argument regarding future dangerousness upon evidence that he had committed several extraneous killings, including that of his mother, a 15–year old girl, an 84–year old woman, and two other women. Applicant's argument did not mention the experts' testimony other than saying, "I can't disagree with these psychiatrists and tell you he's not dangerous, but you didn't hear any psychiatrist say he deserves to die." His argument focused upon carefulness in the jury's deliberations, the impropriety of the death penalty in general and in a religious context, and the questionableness of his having actually committed the extraneous killings. However, he stated that he agreed with one of the experts in that applicant needed to be placed somewhere for the rest of his life under treatment as he was sick.

In its closing argument, the State did remind the jurors that they had indicated during voir dire jury selection that they would answer the special issues fairly and honestly depending upon the evidence. However it primarily challenged applicant's attacks on the evidence of his committing the instant offense and the extraneous killings. It also mentioned that it was not talking about rehabilitating applicant, as nobody had ever been able to do that, and that there was no deterrent effect upon sociopaths and psychopaths like him.

There are differences and similarities to both *Penry* and *Johnson.* In *Satterwhite v. State,* 858 S.W.2d at 425–426, we expressed our view that the essence of the Supreme Court's holding in *Penry* was that only in particular circumstances when evidence is proffered which is relevant as mitigating evidence but its mitigating significance is either quite apart from, or goes beyond, the special issues is a death sentence invalid if the trial court failed to provide the jury some mechanism to account for such mitigating evidence and in its reasoned moral response be able to assess a less severe punishment. As stated previously, "[W]hether or not the protections of *Penry* are required at all depends on whether evidence was presented to the jury which was shown to have a tendency to reduce the moral culpability of the capital defendant in a way not exclusively related to the special issues." *Id.* at 426.

Of critical importance is the language in *Penry* stating that if the sentencer is to make an individualized assessment of the propriety of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to emotional and mental problems may be less culpable than defendants who have no such excuse. *Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278. As discussed above, applicant presented evidence of mental disease/defect, i.e. emotional and mental problems.

This Court has interpreted *Penry* to require a showing of some "nexus" between the mitigating evidence and the offense on trial, i.e. the evidence must tend to excuse or explain the criminal act so as to make that defendant not deserving of death. *See, e.g., Richardson v. State,* 879 S.W.2d 874, —— (Tex.Cr.App.1993); *Satterwhite v. State,* 858 S.W.2d at 427; *Gunter v. State,* 858 S.W.2d 430, 446 (Tex.Cr.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993); *and see Mines v. State,* 852 S.W.2d 941, 952 (Tex.Cr.App.1992) (Baird, J., dissenting), *remanded,* —— U.S. ——, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993).

Applicant argues that there was such a nexus, apparently that there was a connection between his mitigating evidence, which created his deep-seeded hostility and resent-

ment toward females and was triggered by an acute hypersensitivity to criticism and physical assault, and the capital murder of a woman. The psychiatrist indicated that the mental disease/defect may have been operating in applicant on or about October 31, 1979, but that "only God and [applicant] really know for sure, but he floats in and out of [a] psychotic state like every schizophrenic does." He then indicated that if applicant had been in a psychotic state at that time he would not have known the difference between right and wrong, i.e. "[a] person who's in a psychotic state is nothing but a bag of impulses, a caldron [sic] of seething, primitive impulses." He added that "[t]he definition of psychosis is that you're totally out of control[,]" and that "[s]trange things happen when patients are psychotic, and one of the characteristics are [sic], is you are out of control[;] [a]ll the things you know about right and wrong or good and bad, these are irrelevant." The psychiatrist also testified that if applicant "did th[e] offense, that whenever he did those things like that in those things that happened, that there is no question in my mind that he is psychotic and insane." He stated, "Oh, I'm testifying that if [applicant] has done something like that[,] that he was psychotic at the time of any behavior like that." He also added, "I'm perfectly willing to testify that [applicant] was psychotic and insane at the time of the offense. No question about it."

As discussed above, applicant presented evidence of mental disease/defect. He also presented evidence that he was acting under the influence of such when committing the instant offense. Like *Penry*'s evidence of mental retardation and history of abuse, applicant's mental disease/defect evidence may have diminished his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future. As the Supreme Court indicated in *Penry*, that pursuant to the belief, long held

by this society, that defendants who commit criminal acts that are attributable to emotional and mental problems may be less culpable than defendants who have no such excuse, applicant may have been less culpable based upon his emotional and mental problems that may have attributed to the instant offense. As in *Penry*, such evidence was a two-edged sword in that it might diminish applicant's blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future. Accordingly, I conclude that the facts of the instant offense are analogous to those in *Penry*.

As in *Penry*, the special issues alone, without additional instructions permitting the application of such mitigating evidence which was outside the scope of the special issues, did not provide the jury with a vehicle for expressing its reasoned moral response to applicant's mental disease/defect evidence in rendering its sentencing decision.[3] *Rios v. State*, 846 S.W.2d 310 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993); *Richard v. State*, 842 S.W.2d 279 (Tex.Cr.App.1992). As in *Penry*, that evidence was beyond the scope of the special issues.

Because the jury was not allowed to consider and give effect to that evidence, I am compelled by *Penry* and now *Johnson* to conclude that applicant's conviction should be set aside. *Ex parte McGee*, 817 S.W.2d 77 (Tex.Cr.App.1991); *Ex parte Goodman*, 816 S.W.2d 383 (Tex.Cr.App.1991). Therefore, applicant's application for writ of habeas corpus should be granted. Because the majority does not do so, I respectfully dissent.

BAIRD, J., joins dissent.

---

**3.** The instruction, quoted *supra*, op. at 322, which informed the jury that in answering the special issues it could take into consideration all of the evidence submitted at guilt/innocence and punishment, did not empower the jury to assess a sentence of less than death in response to the mitigating evidence beyond the scope of the special issues. It simply informed the jury that it could consider all of the evidence, but provided no guidance or vehicle to apply a "reasoned moral response" to evidence beyond the scope of the special issues. As we pointed out in *Richard v. State*, 842 S.W.2d 279, 280 n. 1 (Tex.Cr.App. 1992), such an instruction telling the jury that it may utilize evidence for whatever mitigating value it may have relevant to the special issues is not a *Penry* instruction.