**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 93-4069
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

PHILIP E. BLACKBURN, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
(December 3, 1993)

Before GOLDBERG, JONES, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

## I.   BACKGROUND

Philip Blackburn and Nickolas Lutz worked together in the home construction business.  In August 1989, Blackburn and Lutz met with officers of First Western National Bank ("FWNB"), a federally insured financial institution, to discuss construction financing. Sometime after the meeting, Lutz wrote a letter to FWNB stating that Lutz Homes, Inc. wished to obtain a loan in the amount of $285,900 to build a speculative home.[1]

As part of the loan package, a Lutz Home financial statement and Lutz's personal financial statement were submitted.

_____

[1]   A speculative home is a residence built by the contractor without a buyer and is used to display the product to potential customers.

Additionally, the bank required a pledge equal to ten percent of the loan amount. Blackburn deposited $24,906 at FWNB to open a certificate of deposit ("CD") under the name "Triple B Construction, Inc" (a corporation owned by Blackburn's family). Shortly after the closing, a bank officer told Blackburn that the loan would not be funded until the balance of the CD was raised to equal ten percent of the loan amount. Accordingly, Blackburn wrote a Lutz Homes check in the amount of $3,684 to Triple B and deposited it in the Triple B CD account. The loan was funded in November 1989.

Lutz and Dennis Dick testified that, one week after closing, Blackburn reviewed the loan documents, and noticed that Lutz, who was not authorized to act for Triple B, had signed the pledge of the Triple B CD. Lutz testified that he did not realize that he had signed on behalf of Triple B until Blackburn brought it to his attention. Lutz and Dick further testified that Blackburn told them that the bank made a mistake and if the loan ever went into default, he could sue the bank and get his (Triple B's) money back. Thereafter, Blackburn made every draw against the loan.

Lutz Homes was unable to sell the speculative home, and the loan went into default. Blackburn signed receipts for the bank's letters of January 15 and 31, 1991, notifying Lutz Homes that the CD had been applied against the balance due. On February 1, 1991, Blackburn went to the bank to get his money back. Blackburn told the bank officer that he wanted to move the CD to another bank for a friend. The bank officer explained that he could not get the CD

back because it had been pledged as collateral and offset against the loan. Blackburn then filed a civil suit against FWNB to recover the money.

After Blackburn sought the CD from FWNB, FWNB filed a criminal referral. When the Federal Bureau of Investigation contacted Lutz, Lutz went to Blackburn to find out what had happened. According to Lutz, Blackburn instructed him to tell the investigators that the money was put up as a compensating balance (cash deposit without a pledge) not pledged. Lutz also testified that Blackburn told him that Blackburn would get the money back plus some, which he would share with Lutz.

Blackburn was indicted on two counts of presenting false financial statements to a federally insured bank and one count of bank fraud. At trial, Blackburn claimed that he thought that the CD was to be used as a compensating balance, he did not give Lutz permission to pledge the CD, and he did not discover that the CD had been pledged until February 1, 1991. The jury found Blackburn guilty of the bank fraud under 18 U.S.C. § 1344, and acquitted him on the other charges. Blackburn was sentenced to a term of eight months imprisonment to be followed by three years of supervised release. The court also ordered restitution in the amount of $55,169, with Lutz jointly and severally liable for $35,539.

Blackburn makes the following arguments on appeal: (1) there was insufficient evidence to support his conviction; (2) the indictment was constructively amended; (3) the indictment omitted a necessary element of the offense; (4) the government relied on

perjured testimony; (5) the government failed to timely disclose material favorable to his defense; (6) the trial court erred by denying his motion for new trial without an evidentiary hearing; and (7) his sentence was improperly computed.  We affirm on all issues except for the calculation of restitution.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

Blackburn contends that the evidence was not sufficient to support a conviction under 18 U.S.C. § 1344(1) or (2).[2]  The standard of review for a sufficiency challenge is "whether any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt."  United States v. Hernandez-Palacios, 838 F.2d 1346, 1348 (5th Cir. 1988) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In making this determination, we "must consider the evidence in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices.  Id. (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).

---

[2]  Section 1344 provides:
> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> (1)  to defraud a federally chartered or insured financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $10,000, or imprisoned not more than five years or both.

4

To convict Blackburn under 18 U.S.C. § 1344(1), the government had to prove that (1) he executed or attempted to execute a scheme or artifice to defraud FWNB and (2) that he acted knowingly. Blackburn's scheme began when he stated that the bank made a mistake and he could get his money back if the loan went bad. With knowledge of the defective pledge, Blackburn made every draw on the loan. Cf. United States v. McBride, 571 F. Supp. 596, 613 (S.D. Tex. 1983) (stating that a party may ratify a contract by intentionally accepting the benefits under the contract), aff'd without opinion, 915 F.2d 1569 (5th Cir. 1990). His scheme was executed when he went to FWNB to withdraw the CD, falsely claiming that he wanted it for a friend and falsely stating that he had no knowledge of the pledge. Moreover, Blackburn's intent to defraud can be inferred from his statement to Lutz and Dick regarding the bank's mistake and other testimony indicating that he knew that the CD was supposed to have been pledged but intended that the bank think it was pledged.

A conviction under the alternative charge of 18 U.S.C § 1344(2) required proof of the same elements as discussed above except (1) the purpose of the scheme must have been to obtain money funds, or credits and (2) the means used must have included false and fraudulent pretenses, representations, and promises. The purpose of Blackburn's scheme was to obtain the full benefit of the loan without having to forfeit the amount pledged in the event of default. Blackburn executed his scheme by falsely claiming that he

5

wanted to withdraw the CD for a friend and denying that he had any knowledge of the pledge.

Blackburn contends that the government did not meet its burden because it did not prove that he actually pledged the CD. He argues that Lutz was not authorized to pledge the CD and that he did not discover that the CD had been pledged until February 1991. He further states that the government's evidence, at most, indicated that he became aware of the improper pledge in November 1989 and did not notify the bank. We disagree. First, although the government alleged that Blackburn physically pledged the CD, it was not required to prove that a legally binding pledge existed. The point of Blackburn's scheme was to assert (falsely) that he never knew a pledge was to be made. Second, the government proved that Blackburn knew that the CD was supposed to have been pledged and that he pretended it was pledged so he would have the benefit of the loan.

Blackburn also argues that he lacked specific intent to defraud because the CD had been offset prior to his attempt to redeem it. The fact that the CD had been offset does not require reversal. Implicit in the indictment and the government's case is that Blackburn sought the value of the CD and not the paper upon which it was written.[3]

---

[3] This case would be different, and criminal liability should not attach, if the facts showed that Blackburn did not know from the outset that there was a discrepancy in the loan documents, did not make false statements to the bank that the CD was intended only as a compensating balance rather than a pledge, and did not advise Lutz to mislead FBI investigators. The bank fraud statute cannot mean that a borrower is criminally at fault whenever he seeks,

6

B.   Constructive Amendment of the Indictment

Blackburn's next contention is that the indictment was constructively amended because the government alleged one set of facts in the indictment but proved another at trial.  The crux of Blackburn's argument is that the government alleged but failed to prove that Blackburn pledged the CD.  As discussed above, the evidence was sufficient to support the government's allegations.

C. Sufficiency of the Indictment

Blackburn urges that the indictment was fatally defective because it did not allege the elements "knowingly" and "executes or attempts to execute."  An indictment does not have to allege the elements in precise statutory terms.  Hagnar v. United States, 285 U.S. 427, 430 (1932).  A count should be read in its entirety, including its use of statutory section numbers.  United States v. Arteaga-Limones, 529 F.2d 1183, 1188, 1200 (5th Cir.), cert. denied, 429 U.S. 920 (1976).  Since the indictment fairly imports all the elements and includes the statutory section number, we find that it was not defective.

D.   Reliance on Perjured Testimony

Blackburn contends that his conviction must be reversed because Lutz, a key government witness, gave perjured testimony.  We will not permit a conviction on tainted testimony, but Blackburn's conviction was not based on tainted testimony.  See Mesarosh v. United States, 352 U.S. 1, 5 (1956).  To obtain a

---

without the use of fraudulent representations, to take advantage of a bank's negligent loan documentation.

reversal on the grounds that the government relied on perjured testimony, the following must be shown: (1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false. United States v. Chagra, 735 F.2d 870, 874 (5th Cir. 1984). Blackburn has not met his burden on any of the elements.

### E. Tender of Material

Blackburn argues that the government violated his due process rights because it did not tender Lutz's grand jury testimony until two days before trial and did not tender FBI interview notes until the sentencing hearing. Blackburn's argument is meritless. Under the Jencks Act, 18 U.S.C. §3500, the government is not required to tender a witness's grand jury testimony until the witness has testified on direct examination. See 18 U.S.C. § 3500(a). In this case, the trial court ordered the government to turn over all Jencks Act material the day before a witness was to testify. The government complied with the court order and the Jencks Act by delivering all Jencks Act material two days before trial. The government was not required to tender the FBI interview notes because they are not discoverable. See United States v. Welch, 810 F.2d 485, 490 (5th Cir.), cert. denied, 484 U.S. 955 (1987). Furthermore, the court made an in camera review of the notes and found that there was no exculpatory evidence in them.

### F. Denial of Evidentiary Hearing

Blackburn contends that the denial of his motion for a new trial without an evidentiary hearing was a due process violation.

8

A motion for new trial may be ruled on without an evidentiary hearing, and the decision to hold a hearing rests within the sound discretion of the trial court. Chagra, 735 F.2d at 873. We find no indication that the trial court abused its discretion.

### G.  Sentencing

The remaining issues involve Blackburn's sentence. Blackburn argues that (1) the court erred by adding five points to his base level offense; (2) the court should have reduced his base level by three points because it utilized intended, as opposed to actual, loss; and (3) the court erred in computing restitution.

1.  Five-point increase.  Under the Sentencing Guidelines, bank fraud has a base level of six.  See U.S.S.G. § 2F1.1(A). Offense characteristics are added to the base level depending on the amount of the loss incurred by the victim.  The trial court added five levels because it determined that the loss was more than $40,000 but less than $70,000.  In making this determination, the trial court included the intended loss of the CD ($28,590) and attorney's fees incurred by the bank in defending Blackburn's civil suit ($20,878).

Blackburn argues that the guidelines do not authorize the trial court to use intended loss.  This argument is without merit. Section 2F1.1 application note 7 provides, "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." Because the actual loss is limited to attorney's fees from the

9

civil suit, the court appropriately used the loss intended by Blackburn.

Blackburn also argues that the court should not have included the attorney's fees in the loss calculation because the civil suit was not directly related to the offense charged in the indictment, the fees were excessive and unreasonable, and the fees included time spent on matters related to the criminal prosecution. We disagree. Blackburn's scheme was to get his pledged document back from the bank in the event that the loan went into default. Filing a civil suit against the bank was part of that scheme, and therefore, the attorney's fees were properly included in the loss. Other than his conclusory assertions, he offers no evidence to support his allegation that the fees were excessive and unreasonable. And while the detail of legal fees provided by the government does include entries relating to the criminal trial, Blackburn has not proved that these fees were included in the total used by the court.

2. Three-point reduction. Blackburn's second contention is that because the trial court utilized the intended loss, rather than the actual loss, his offense level should have been reduced by three levels. Section 2F1.1 n.9 provides that "in the case of a partially completed offense (e.g., an offense involving a completed theft that is part of a larger, attempted theft), the offense level is to be determined in accordance with the provisions of § 2X1.1." In turn, § 2X1.1(b)(1) requires that the base offense level be reduced by three levels unless the defendant completed all the acts

necessary for a successful completion of the substantive offense. Blackburn's offense, however, was not a partially completed offense. Although his scheme failed, Blackburn completed all of the necessary acts when he filed suit against the bank.

3. Restitution. Defendant's final contention is that the court erred by including the attorney's fees incurred in defending the civil suit ($20,878) and the bank's total loss on the defaulted loan ($34,291) in the restitution. "Restitution is limited to losses caused by the specific conduct underlying the offense of conviction." United States v. Stouffer, 986 F.2d 916 (5th Cir. 1993) (citing Hughey v. United States, 495 U.S. 411, 414 (1990)). The attorney's fees were a direct result of Blackburn's offense, and thus, were properly included. The foreclosure expenses, however, were not caused by Blackburn's scheme. Rather, the foreclosure would have occurred regardless of Blackburn's scheme. These expenses should not have been included in the restitution.

### III. CONCLUSION

For the foregoing reasons, we reverse and remand on the issue of restitution and affirm all other issues.

AFFIRMED in part. REVERSED and REMANDED in part.