**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**
No. 95-10802

HERBERT BOYLE,

                         Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

                         Respondent-Appellee.

_____

Appeal from the United States District Court
For the Northern District of Texas
_____

August 16, 1996

Before KING, EMILIO M. GARZA, and DEMOSS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Benjamin Herbert Boyle, sentenced to death for the murder of
Gail Lenore Smith, appeals the district court's denial of his
petition for writ of habeas corpus.  Finding no reversible error,
we affirm.

I

Gail Lenore Smith drove with her step-brother and sister-in-
law to a rest stop outside Fort Worth, Texas.  Smith planned to
obtain a ride from a truck driver in order to visit her mother in
Amarillo.  She asked her relatives to write down the license number
of the truck she boarded, in case anything happened.  A few minutes

after arriving at the rest stop, Smith's relatives observed her approach a male truck driver, converse with him, and then board his cherry-red Peterbilt tractor-trailer.

The next day, a passing truck driver discovered Smith's naked body, bound with duct tape, concealed in a brushy area fourteen miles north of Amarillo. Although Smith's relatives had failed to write down the truck's license number, they were able to give authorities a description of the driver and the truck, including the inscription "JEWETT SCOTT, Truck Line Inc., Magnum Oklahoma" which was written on the side of the truck. Through this information, the authorities were able to trace the tractor-trailer to Boyle, and after conferring with Jewett Scott Truck Lines in Oklahoma, learned that Boyle's ultimate destination was Diboll, Texas. Boyle was arrested in Diboll, and gave investigators written consent to search his truck.[1] Inside the truck, officers found several of Smith's possessions. Officers also found hairs from Smith's head and pubic area, some of which had been forcibly removed. In addition, blood stains in the sleeper portion of the truck were consistent with Smith's blood type. Subsequently, Boyle's fingerprints were found on the strips of duct tape used to bind Smith, and fibers taken from Smith's body matched the carpet in Boyle's truck. Medical evidence showed that Smith had been orally and anally raped, beaten with a blunt instrument, and strangled to death. Boyle continued to maintain that he had

---

[1] Officers also obtained consent to search the vehicle from Jewett Scott, the owner of the truck.

dropped Smith off at a truck stop unharmed.

Boyle was indicted for capital murder during the course of committing or attempting to commit aggravated sexual assault, and capital murder during the course of kidnaping. Boyle pleaded not guilty, and was tried before a jury. The evidence at trial consisted of the physical evidence linking Boyle to the murder, medical evidence indicating the sexual nature of the murder, and other evidence tending to show Boyle's obsession with sex. The jury found Boyle guilty on all counts and, after hearing evidence relevant to punishment, returned affirmative answers to the special issues found in article 37.071 of the Texas Code of Criminal Procedure. As required by law, the trial court sentenced Boyle to death.

On automatic appeal, the Texas Court of Criminal Appeals reversed Boyle's conviction on the grounds that his arrest had been unlawful, and thus the evidence obtained pursuant to that arrest had been admitted in violation of Boyle's constitutional rights. *Boyle v. State*, 820 S.W.2d 122, 137 (Tex. Crim. App. 1989). The state moved for rehearing *en banc*, and the Court of Criminal Appeals reversed itself, reinstating Boyle's conviction and sentence on the grounds that Jewett Scott's consent to search the truck was constitutionally adequate. *Id.* at 143. The Supreme Court denied Boyle's petition for writ of certiorari. Boyle then pursued state habeas relief. A hearing was held, and the trial court entered its findings of facts and conclusions of law denying Boyle's habeas petition. The Court of Criminal Appeals affirmed

-3-

the trial court, holding that the lower court's findings and conclusions were supported by the record. Boyle then filed a petition for federal habeas relief in the Northern District of Texas. The district court denied his petition, but granted a certificate of probable cause to appeal. Boyle now appeals the district court's order denying his habeas petition.

II

Boyle argues that the trial court erred in admitting evidence of his sexual habits and drawings. Boyle maintains that admission of this evidence violated his First Amendment right to not have evidence of his associations and expressions admitted against him at sentencing. While there is no "*per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment," the government may not admit such evidence indiscriminately. *Dawson v. Delaware*, 503 U.S. 159, 165, 112 S. Ct. 1093, 1097, 113 L. Ed. 2d 465 (1992). The Supreme Court has explicitly held that in order for such evidence to be admissible, it must be sufficiently related to the issues involved. *See id*. (disallowing admission of evidence indicating that defendant belonged to racist "Aryan Brotherhood" gang in prison where there was no racial component to the crime committed).[2] Thus, we must

_____

[2]     *Dawson* involved a death sentence based in part on a stipulation that Dawson belonged to a racist gang, the Aryan Brotherhood. The Supreme Court held that the stipulation was inadmissible because the state had failed to show that the evidence was in any way linked to an issue at sentencing. Dawson and his victim were white, and therefore the murder had no racial component. In addition, the stipulation contained no evidence that the Aryan Brotherhood advocated violence against any particular group. The Supreme Court ruled that, without such evidence, the stipulation was inadmissible since it "proved nothing

-4-

determine if the evidence of Boyle's sexual relations and expressions was sufficiently related to the issues at sentencing. After carefully reviewing the record in this case, we hold that the evidence was sufficiently related to the crime committed to allow its admission during the capital sentencing phase of Boyle's trial.[3]

At sentencing, the trial court first admitted all the evidence that had been admitted at the guilt-innocence phase, including three letters and brief testimony concerning Boyle's preoccupation with sex.[4] The state then put on additional testimony concerning Boyle's sexual habits and evidence concerning his sexual drawings.[5]

___

more than Dawson's abstract beliefs." *Dawson*, 503 U.S. at 165-66, 112 S. Ct. at 1097-98.

[3]    We therefore need not address whether Boyle's sexual associations and drawings are protected by the Constitution. *Cf. Wallace v. Texas Tech University*, 80 F.3d 1042, 1051 (5th Cir. 1996) (recognizing that the type of intimate associations protected by the First Amendment are limited to those involving "deep attachments and commitments"); *Johnson v. San Jacinto Jr. College*, 498 F. Supp. 555, 575 (S.D. Tex. 1980) (holding that the "right to privacy in sexual intimacy is grounded on the marriage relation . . . but currently does not protect the sexual relations themselves").

[4]    This evidence was admitted at the punishment phase by operation of law. *Richard v. State*, 842 S.W.2d 279, 281 & n.2 (Tex. Crim. App. 1992). The testimony concerning Boyle's sexual habits came primarily from Boyle's lover Pat Willis. She testified that she had had an affair with Boyle and that he had lied to her about his marital status in order to begin the affair. Willis further testified that Boyle wrote her sexually explicit letters referring to her genitalia as "Miss. Kitty" and to his own as "Mr. Whipple." The three letters contained statements such as, "I would unleash Mr. Whipple on you. Ha! Ha! I know you can handle him. He knows it too. At this very moment, I believe he knows I'm talking about him. He seems to be stirring. Oh, mama, do I need you." One letter states, "Miss Kitty is in some real trouble now. I may not be able to tear her up, but she will know Mr. Whipple has been there."

[5]    The additional testimony at sentencing included statements by Boyle's daughter that Boyle was a "womanizer" and that he drew and kept many explicit sexual pictures. Norma Myers, a former lover, also testified that Boyle had a strong preference for oral and anal sex, that he put pressure on her to perform these acts, and that he sometimes held her down and pretended to choke her during foreplay. Finally, an inmate formerly incarcerated with Boyle testified that Boyle associated violence with sex. According to this witness, whenever another inmate mentioned trouble with women, Boyle would remark that, "If it was me, I'd

-5-

The state argues that the evidence was sufficiently related to the second special issue, the issue of future dangerousness, to survive a *Dawson* challenge.[6]  According to the state, the evidence showed that Boyle was obsessed with sex, and that he associated sex with violence, facts which ultimately resulted in a sexually motivated murder.  After carefully reviewing the record, we believe the state satisfied the requirements of *Dawson*.  As the Supreme Court noted in *Dawson*, "In many cases . . . associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society."  *Dawson*, 503 U.S. at 166, 112 S. Ct. at 1098.  *Dawson* simply requires that the evidence be relevant to an issue at sentencing.[7]  *Id.*  Here the state put on evidence that Boyle was obsessed with sex, and that his sexual expression had a

---

slap her, throw her down on the floor and fuck her in the ass."  The state also introduced a sexually explicit picture, drawn by Boyle, of a woman using a complicated mechanical device to masturbate.

[6]     Article 37.071(b)(2) of the Texas Code of Criminal Procedure defines future dangerousness as "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

[7]     Our analysis is guided by the Supreme Court's discussion of *Barclay v. Florida*, 463 U.S. 939, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983) in *Dawson*. As the Supreme Court stated,

> Even if the Delaware group to which Dawson allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case.  For example, the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim. In *Barclay*, on the contrary, the evidence showed that the defendant's membership in the Black Liberation Army, and his consequent desire to start a "racial war," were related to the murder of a white hitchhiker . . . .  In the present case, however, the murder victim was white, as is Dawson; elements of racial hatred were therefore not involved in the killing.

*Dawson*, 503 U.S. at 166, 112 S. Ct. at 1098 (citations omitted).  Our case presents an analytically similar situation to the one presented in *Barclay*.  Here Boyle's obsession with sex led to a sexually motivated murder.  Accordingly, evidence of Boyle's sexual obsession was relevant to the issue of his future dangerousness.

-6-

violent component. Unlike the situation in *Dawson*, where there was no connection between the evidence presented and the crime committed, Boyle was convicted for a murder which had a sexual component. *See O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir.) (finding evidence that defendant was a member of a racist group relevant and therefore admissible under *Dawson* where "racial animus as a motive for [the] murder was an issue in the trial"), *cert. denied*, ___ U.S. ___, 116 S. Ct. 129, 133 L. Ed. 2d 78 (1995). Evidence of Boyle's sexual obsession was thus relevant to the issue of Boyle's future dangerousness; it tended to show that Boyle "would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071(b)(2) (Vernon 1981).[8] Accordingly, we hold that the district court did not err in finding a sufficient nexus under *Dawson* to allow the state to present evidence of Boyle's sexual habits and sexual drawings at sentencing.[9]

---

[8] We distinguish this case from *Beam v. Paskett*, 3 F.3d 1301 (9th Cir. 1993), *cert. denied* ___ U.S. ___, 114 S. Ct. 1631, 128 L. Ed. 2d 354 (1994). In *Beam*, the state had, at the punishment phase of a capital trial, introduced evidence that the defendant was the victim of incest, had engaged in homosexuality, and had "abnormal sexual relations with women both older and younger" than himself in order to show that Beam deserved the death penalty. *Id*. at 1308. All of the evidence concerned acts that were "non-violent, consensual, or involuntary." *Id*. Although Beam had committed the murder during the course of a rape, the state failed to provide any link between Beam's sexual history and either violence generally or the sexual nature of the crime. *Id*. at 1309-10. Without such a link, the court noted that the evidence in no way "indicated that he was likely to commit future violent acts." *Id*. at 1309. In contrast, here the state put on evidence that Boyle was obsessed with sex and that his obsession had a violent component, which had its ultimate expression in a violent rape and murder. The evidence of Boyle's sexual habits was thus linked to a determination of Boyle's future dangerousness.

[9] In addition, Boyle argues that the presentation of evidence regarding his sexual habits at the guilt-innocence phase of his trial also violated the dictates of *Dawson*. *Dawson*, however, dealt solely with the introduction of such evidence at sentencing. *Dawson*, 503 U.S. at 168-69, 112 S. Ct. 1099. It is unclear whether *Dawson* should be applied at the guilt-innocence phase. We note at the outset that the Texas Rules of Criminal Evidence only allow the admission of evidence that is "relevant" to a fact "that is of consequence to the

-7-

III

Boyle next contends that he was denied a fair trial because of the state's presentation of false and misleading testimony from a clinical pathologist, Dr. Ralph Erdmann. Boyle contends that Dr. Erdmann's gross misconduct in other cases indicates that the testimony Dr. Erdmann gave was perjured. Boyle also maintains that the prosecutor knew that Erdmann was unreliable in his handling of evidence and in his testimony from the stand, but failed to notify the defense in violation of the dictates of *Brady v. Maryland*, 383 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

In order to establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution had knowledge that the witness's testimony was false. *Westley v.*

---

determination of the action." TEX. R. CRIM. EVID. 401. In addition, evidence of "other crimes, wrongs, or acts" may only be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident." TEX. R. CRIM. EVID. 403. It is unclear how these evidentiary requirements differ from the nexus requirement set forth in *Dawson*. *See Snell v. Lockhart*, 14 F.3d 1289, 1299 n.8 (8th Cir.) (declining to disallow associational evidence under *Dawson* because "most of the . . . evidence in this case was relevant."), *cert. denied*, ___ U.S. ___, 115 S. Ct. 419, 130 L. Ed. 2d 330 (1994); *United States v. Robinson*, 978 F.2d 1554, 1565 (10th Cir. 1992) (applying *Dawson* to a non-capital trial and allowing admission of associational evidence because the evidence was specific and relevant to the offenses charged), *cert. denied*, 507 U.S. 1034, 113 S. Ct. 1855, 123 L. Ed. 2d 478 (1993). Because we find the nexus requirement of *Dawson* satisfied, we need not decide whether *Dawson* should be applied at the guilt-innocence phase of a capital murder trial. In this case the state introduced the evidence of Boyle's sexual habits to establish the motive for the sexual assault and kidnaping, both part of the crimes for which Boyle was indicted and ultimately convicted and sentenced to death. Assuming *arguendo* that *Dawson* applies to the guilt-innocence phase, we conclude that a sufficient nexus existed to allow consideration of the evidence at issue. *See United States v. Beasley*, 72 F.3d 1518, 1527 (11th Cir. 1996) (citing *Dawson* and stating that "The First Amendment's protection of beliefs and associations does not preclude such evidence where relevant to a trial issue.").

-8-

Johnson, 83 F.3d 714, 726 (5th Cir. 1996); East *v. Scott*, 55 F.3d 996, 1005 (5th Cir. 1995). We will reverse a conviction obtained through the use of tainted testimony. *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 115 S. Ct. 102, 130 L. Ed. 2d 51 (1994). In addition, the state must also disclose information that would serve to impeach a witness. *United States v. Martinez-Mercado*, 888 F.2d 1484, 1488 (5th Cir. 1989). Failure to disclose such evidence will result in reversal if it is "reasonably probable" that disclosure of such evidence would have made a difference in the result at trial. *Kyles v. Whitley*, ___ U.S. ___, ___, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995).

Boyle's attack on Dr. Erdmann's testimony is based on the testimony of one expert at trial, and two experts who testified at Boyle's habeas hearing. These experts disagreed with Erdmann's analysis and interpretation of the evidence presented in Boyle's case.[10] Boyle also points to the fact that Dr. Erdmann subsequently pleaded no contest to charges that he falsifyed autopsies in other

---

[10] Dr. Erdmann testified that he observed anal dilation post mortem which he interpreted as evidence that something, possibly a penis, had been inserted into the victim's anus from the outside. Erdmann testified that this dilation could not have been naturally caused by death. Further, Erdmann testified that he observed an anal fissure or tear which he also interpreted as indicating that something had been inserted in the victim's anus. Finally, Erdmann testified that he found a slight amount of "prostatic antigen," a component of semen, in the victim's mouth. He interpreted this to mean that the perpetrator had ejaculated into the victim's mouth shortly before death because the antigen would not have been present had the victim lived for very long after the ejaculation. At trial and at the habeas hearing, other experts challenged Dr. Erdmann's conclusions. These experts testified that a victim's anus can dilate at death, that the slight anal tear was not caused by violent insertion, that the slight amount of prostatic antigen found in the victim's mouth is inconsistent with ejaculation because it contained no sperm and the amount was too small to indicate ejaculation.

cases as evidence that Dr. Erdmann lied in this case.[11]  As the district court noted, however, the state trial court, in reviewing Boyle's habeas petition, made findings of fact rejecting Boyle's contentions that Dr. Erdmann perjured himself in Boyle's case. These findings of fact are entitled to a "presumption of correctness" in federal habeas proceedings.  *Williams v. Collins*, 16 F.3d 626 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 42, 129 L. Ed. 2d 937 (1994).  The presumption is particularly strong where, as here, the habeas court was the same court that presided over the trial.  *May v. Collins*, 955 F.2d 299, 314 (5th Cir.), *cert. denied*, 504 U.S. 901, 112 S. Ct. 1925, 118 L. Ed. 2d 533 (1992).

After carefully reviewing the record, we cannot say that Boyle has presented evidence sufficient to overcome the presumption of correctness owed state habeas court findings of fact.  The fact that other experts disagreed with Dr. Erdmann is insufficient, by itself, to call Dr. Erdmann's testimony into question. Additionally, we note, as the district court did, that the state presented a great deal of physical evidence connecting Boyle to the murder.  Dr. Erdmann's testimony was consistent with the state's physical evidence, whereas much of the conflicting expert testimony was inconsistent with this other evidence.[12]  This alignment

---

[11]  Dr. Erdmann is currently imprisoned for falsifying autopsy reports.

[12]  Indeed, as the district court noted, Boyle's experts themselves disagreed as to the proper interpretation of the evidence on such important questions as whether the substances found in the victim's mouth indicated that she had been orally sodomized.

supports the district court's decision to credit the state habeas court's finding that Erdmann did not testify falsely. Finally, although Dr. Erdmann has been accused of misconduct in other cases, Boyle has presented no evidence that Dr. Erdmann did so in this particular case. Accordingly, Boyle has failed to overcome the presumption of correctness applied to the state habeas court's factual findings, and we therefore affirm the district court's ruling that Dr. Erdmann did not testify falsely or mislead the jury.[13]

Further, we also reject Boyle's contention that the state knew of Erdmann's unreliability prior to Boyle's trial and failed to notify the defense for impeachment purposes. The state habeas court made a finding that the prosecution was not aware of Erdmann's serious shortcomings at the time of Boyle's trial. This finding is also entitled to a presumption of correctness. A careful review of the record shows that the only evidence indicating that the state had any reservations about Erdmann was prosecution testimony relating to Erdmann's workload, not his competence or professional practices. It was not until 1987 or 1988, after the completion of Boyle's trial, that the prosecution was alerted to the possibility that Dr. Erdmann had falsified autopsies and committed perjury in other cases. Accordingly, we

---

[13] Because we find that the district court did not err in upholding the habeas court's finding that Dr. Erdmann did not testify falsely, we also find that the state had no duty to correct Dr. Erdmann's testimony. *See Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (rejecting claim that state had a duty to correct false testimony because defendant failed to show that the testimony was actually false).

agree with the district court that Boyle has failed to establish that the state improperly withheld impeachment evidence from the defense. Boyle has presented no evidence to call into question the state habeas court's findings, upheld by the district court, that Erdmann did not perjure himself in this case, and that the prosecution had no knowledge of Erdmann's abuses prior to trial.

IV

Boyle argues that the district court erred in denying his petition for habeas relief on the ground that his attorney rendered ineffective assistance at the punishment phase of his trial. According to Boyle, his counsel failed to present significant mitigating evidence that was either known to his counsel or should have been known to his counsel. Boyle maintains that his counsel did not present evidence of his mental illness, violent family background, economic deprivation, voluntary intoxication, drug and alcohol addictions, and testimony as to his many positive traits.

We review ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Ineffective assistance of counsel is a mixed question of law and fact which we review *de novo*. *Id.* at 698, 104 S. Ct. at 2070; *Bryant v. Scott*, 28 F.3d 1411, 1414 (5th Cir. 1994). To obtain reversal of a conviction or death sentence based on ineffective assistance of counsel, a convicted defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. A

-12-

finding of deficient performance requires a showing that counsel's performance fell below an objective standard of reasonableness as defined by prevailing professional norms. *Id*. Informed strategic decisions are given a heavy measure of deference. *Mann v. Scott*, 41 F.3d 968, 984 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1977, 131 L. Ed. 2d 865 (1995). In order to satisfy the prejudice prong, the defendant must show that the outcome was rendered unreliable or the proceeding fundamentally unfair. *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1358, 134 L. Ed. 2d 525 (1996).

After careful review of the record, we find that Boyle has failed to establish that his counsel was deficient at trial. At Boyle's writ hearing, his trial counsel testified that he did not introduce certain evidence concerning Boyle's background and character for tactical reasons. As to the evidence of Boyle's violent family background, trial counsel responded, "It would have been aggravating." As counsel put it, "We were trying to keep as much violence as we possibly could out of the record." Counsel was concerned that evidence of his abusive father would cause the jury to think, "like father, like son." As to the evidence of drug and alcohol abuse, counsel stated, "It would have been aggravating." Counsel continued, "I did not think it was beneficial, particularly in 1986 to tell this jury that he was a pill popping . . . truck driver."[14] Counsel also made strategic decisions not to put into

---

[14] As to Boyle's possible mental illness, the defense was concerned that the evidence would not be mitigating. Further, the defense was concerned that if they put on such psychiatric evidence, the state would put on its own

evidence Boyle's non-sexual drawings,[15] and the testimony of other women with whom Boyle had had sexual relations.[16] In essence, all the evidence that Boyle maintains should have been presented at the punishment phase of his capital murder trial had a double-edged quality.[17] *See Mann*, 41 F.3d at 984 (noting the heavy deference owed trial counsel when deciding strategically to forego admitting evidence of a "double edged nature" which might ultimately harm a defendant's case). Accordingly, we find that Boyle has failed to overcome the strong presumption that these informed tactical decisions were reasonable under the circumstances. *Id*. Boyle has thus failed to satisfy the deficiency prong of *Strickland*, and we hold that the district court did not err in rejecting Boyle's habeas petition on the grounds that his counsel provided

---

psychiatrist to testify as to Boyle's violent tendencies.

[15]    Boyle's counsel testified,

Well, because Mr. Boyle, while being a rather articulate artist, there were two types of art that he delved in. He had the capability of drawing a small kitten that looked so soft you would want to pick it up and pet it. . . . He also had the ability to draw masochistic sadistic cult type art depicting women in bondage under the throes of demonic type men. And I don't think that that was the type of art that was conducive to convincing a jury not to kill him.

[16]    Boyle's counsel testified that all the women who were willing to testify as to Boyle's good nature were women with whom he was having adulterous relations. As Boyle's counsel put it, "If I put in about alcohol and his womanizing and his running around on his wife and his running around on his girlfriends, that is not going to be a mitigating factor in Amarillo, Texas."

[17]    As Boyle's counsel testified, "Well, every family member I talked to was a possible mitigation witness. Every girlfriend I talked to was a possible mitigation witness. But every time I talked to some of these people, the I))there were other problems associated with it." Boyle's counsel concluded, "That's why we didn't talk about his use of amphetamines while driving a truck. That's why we didn't talk about his alcoholism. That's why we didn't talk about the child abuse. That's why we damn sure didn't talk about his sex life."

ineffective assistance.[18]

V

We note that while this appeal was pending, Congress passed The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132. 110 Stat. 1214 ("AEDPA"). The AEDPA modifies the statutory provisions relevant to all habeas corpus cases. These changes include, *inter alia*: a one year statute of limitation for habeas cases; new procedures for obtaining a "certificate of appealability" to the circuit courts; and limitations on successive habeas petitions. *See generally* §§ 101-106. Congress, however, did not specify an effective date for §§ 101-106. Because we reject Boyle's habeas petition under the old standards, which we read as more permissive, we decline to address whether Congress intended these general provisions to apply to appeals pending when the AEDPA was enacted. *See Callins v. Johnson*, No. 95-11049, 1996 WL 390860 at *6 (5th Cir., Jan. 12, 1996) (declining to address whether the Act applies where it would make no difference in the outcome of the case). Additionally, the AEDPA alters the standards of review applicable to death penalty habeas cases, arguably

---

[18] We also reject Boyle's contention that his trial counsel failed to adequately investigate possible mitigation evidence. Counsel's testimony during the state habeas hearing indicates that they attempted to talk to a great number of mitigation witnesses, supplied by Boyle himself. As counsel put it, most of these witnesses "were as harmful or more so than the good that could come from it." In fact, several members of Boyle's own family testified against him at sentencing. In addition, Boyle's counsel was aware of most of the evidence that Boyle claims his counsel would have discovered through further investigation, but they had decided that the evidence was more harmful than helpful to Boyle's case. Accordingly, we cannot say that Boyle's counsel was ineffective in failing to adequately investigate possible mitigation evidence. *See Anderson v. Collins*, 18 F.3d 1208, 1220-21 (5th Cir. 1994) (holding that failure to investigate did not rise to ineffective assistance of counsel because the evidence was either cumulative, unknown, or possibly harmful to the defense).

-15-

restricting the scope of our review.[19]  Although § 107 specifies that it shall be applicable to all cases "pending on or after the date of enactment of this Act," the state is only entitled to the more restrictive standards of review if certain provisions, designed to ensure appointment of counsel, are met.[20]  Because we reject Boyle's claims under the old standards of review, we decline to address whether Texas has met its burden under the Act.

VI

For the foregoing reasons, the district court's decision to deny Boyle's petition for writ of habeas corpus is AFFIRMED.

---

[19]     In death penalty cases, the Act limits review of questions of law to those adjudicated in the state courts and allows reversal only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." *See* § 107. As to factual questions, the Act limits reversal to decisions "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* § 107.

[20]     Section 107 is applicable only if the state establishes, subject to certain restrictions, "a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners." *See* § 107.

-16-

KING, Circuit Judge, specially concurring:

Boyle's able habeas counsel has done a remarkable job developing "_Dawson_ issues" in this case, and my scholarly brother has been most generous in the extensive treatment of those issues provided in the majority opinion. I am reluctant to subscribe to that treatment, however, and I therefore concur in the judgment.