# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-70007

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2016

Lyle W. Cayce
Clerk

KOSOUL CHANTHAKOUMMANE,

　　　　Petitioner–Appellant,

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

　　　　Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

Before PRADO, OWEN, and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

In 2007, a Texas jury convicted Petitioner–Appellant Kosoul Chanthakoummane of capital murder and sentenced him to death. After unsuccessfully seeking state habeas relief, Petitioner filed a federal habeas corpus petition asserting 16 constitutional errors. The district court denied his petition and declined to grant a certificate of appealability ("COA").

Petitioner now seeks a COA to appeal the district court's dismissal of his federal petition on two grounds: (1) his trial counsel was ineffective for failing to sufficiently investigate, develop, and present mitigating evidence and (2) his trial counsel was ineffective for failing to challenge whether the murder was

No. 15-70007

committed during the commission of a robbery. After careful consideration of his arguments and the record, we deny his application for a COA.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The guilt phase of Petitioner's trial

On July 8, 2006, real estate agent Mamie Sharpless received a call from a man identifying himself as "Chan Lee" who said he wanted to look at a townhome listed in the Craig Ranch neighborhood of McKinney, Texas. According to Sharpless, the man said he had just moved to the area from North Carolina. He also said he was calling from a pay phone at a 7-Eleven near the intersection of "Midway and Park" because he did not have a cell phone.

Sharpless arrived at the Craig Ranch neighborhood with her husband between 11:30 a.m. and noon. Sharpless stated that they waited in their car until a man in a white Ford Mustang drove by and parked in front of the D.R. Horton model home near the listed townhome. They approached the car and asked if he was "Chan Lee," to which he replied, "No." Sharpless described the person in the white Mustang as a muscular man of Asian descent, who was about 5'4" or 5'5" tall and had a buzz cut. During the trial, Sharpless identified Petitioner as the man she saw that day. Shapless's husband stated that while Sharpless showed the townhome to another potential buyer, he looked out the window and saw Sarah Walker, another real estate agent, arrive in the neighborhood and enter the D.R. Horton model home where she worked.

At roughly 1:10 p.m., a couple entered the D.R. Horton model home to find it "ransacked" and noticed a large pool of blood in the dining room. A trail of blood led to the kitchen where they found Walker's body lying face up, her upper body covered in blood. An autopsy found that while Walker exhibited some defensive injuries indicating a struggle, she had sustained several blunt force traumas to her head resulting in a broken nose and fractured teeth and

2

had been stabbed 33 time, 10 of which penetrated her vital organs. Walker also had a bite mark on her neck.

According to Walker's ex-husband, who saw her the morning of the day she was killed, she showed him a new Rolex watch she had recently purchased. Photos from a Bank of America branch that Walker visited at approximately 11:45 a.m. that morning showed Walker wearing a watch and a ring. When Walker's body was discovered, both were missing. When police later searched Walker's home, while they found a box to a Rolex watch and its receipt, the watch was never located.

At the crime scene, McKinney police found a bloody fingerprint on the dead bolt of the model home's front door. Analysis of the DNA found under Walker's fingernails, on the deadbolt, and from other parts of the model home linked Petitioner to the murder. After the police received the results of this DNA analysis, they arrested Petitioner on September 5, 2006.

Texas Ranger A.P. Davidson testified that Petitioner owned a white Ford Mustang and lived approximately three miles from the pay phone at the intersection of Midway and Park where "Chan Lee" had said he was calling Sharpless from. Officer Davidson also stated that he spoke to Petitioner's sister who said that Petitioner had attended school in North Carolina and had moved from Charlotte, North Carolina, to Dallas in February 2006.

Petitioner was questioned at the McKinney Police Department. At first, Petitioner denied having been in McKinney on the day of the murder. He then relented, stating that his car had broken down in front of "a model house." He said that he knocked on the model home's door and took "three or four steps" inside. Finding no one there, he went back outside where he spoke to a man and woman. Petitioner next stated that he went back into the model home to get a drink of water but couldn't figure out how to use the faucet, so he left. He also said that at this time he had "old cuts" on his hands "from work," and

opined that this might explain how his blood could have ended up in the model home.

At trial, the jury heard the testimony of Dr. Brent Hutson, a forensic dentist who examined Petitioner and concluded that "within reasonable dental certainty beyond a doubt" that Petitioner was responsible for the bite mark on Walker's neck. Petitioner's trial counsel called its own dental expert who criticized aspects of Dr. Hutson's analysis and opined that the bite mark found on Walker's neck was not distinctive enough to conclude that it came from Petitioner.

Several experts testified about the DNA analysis done on samples found in the model home and on Walker's body. The State's witness, Dr. Stacy McDonald, testified about the process used to analyze the genetic material found in the model home and under Walker's fingernails and stated that it matched Petitioner's DNA profile. Petitioner's trial counsel cross-examined Dr. McDonald and called its own expert in an attempt to undermine Dr. McDonald's testimony.

After hearing this evidence, the jury found Petitioner guilty of intentionally killing Walker with a deadly weapon while in the course of committing a robbery.

**B.     The punishment phase of Petitioner's trial**

At the punishment phase, the jurors learned about Petitioner's early life, including his interactions with law enforcement and the criminal justice system. This included a conviction for attacking a friend causing six fractured ribs, a concussion, and other injuries. The jury also learned that shortly after this incident, Petitioner attacked another person leaving the victim with a fractured arm.

The jury learned that in 1997, while on furlough from a juvenile facility, Petitioner, along with two friends, broke into a home, robbed the residents at

gunpoint, restrained them using an electrical cord, and then stole a car belonging to one of the victims. He pleaded guilty to kidnapping and robbery and was sentenced to 51 to 71 months imprisonment. The jurors also learned that Petitioner was a member of a gang associated with the Crips, and that while in prison he was punished for possessing a "shank or some type of weapon."

The defense's case on mitigation focused mainly on trying to show that Petitioner did not pose a future risk. The director of one of the facilities that Petitioner had been placed in as a juvenile testified that he had not known Petitioner as someone that "created problems." He also remembered Petitioner as a talented artist who was humble and quiet.

Several corrections officers from North Carolina testified that Petitioner did not have any disciplinary issues, had not caused problems while incarcerated, and that they did not consider Petitioner to be dangerous during the time they knew him. A fellow inmate testified that Petitioner had not caused trouble during the time they were incarcerated together.

A forensic clinical psychologist testified that based on a review of Petitioner's prison disciplinary record, there was not a high probability that he would commit criminal acts of violence while incarcerated or constitute a continuing danger to society. The defense also called Petitioner's case manager from North Carolina, who stated that she remembered him as being "very quiet [and] polite."

After considering this information, the jury sentenced Petitioner to death.

## C.    **Procedural background**

Following his conviction and sentence, Petitioner filed a direct appeal to the Texas Court of Criminal Appeals ("TCCA"). The TCCA denied his appeal and affirmed his conviction and sentence. *Chanthakoummane v. State*, No. AP-

No. 15-70007

75,794, 2010 WL1696789 (Tex. Crim. App. April 28, 2010) (unpublished). Petitioner sought review by the Supreme Court of the United States, which denied his petition for a writ of certiorari. *Chanthakoummane v. Texas*, 131 S. Ct. 506 (2010).

Petitioner filed his state petition for a writ of habeas corpus in April 2010. The state trial court conducted an evidentiary hearing, entered findings of fact and conclusions of law, and recommended that the petition be denied. *Ex Parte Chanthakoummane*, No. WR-78,107-01, 2013 WL 363124, at *1 (Tex. Crim. App. Jan. 30, 2013) (unpublished). On appeal, the TCCA affirmed. *Id.* Petitioner filed his federal petition for a writ of habeas corpus in January 2014, raising 16 grounds for relief. In March 2015, the district court denied the petition and declined to grant a COA.

## II.    JURISDICTION AND STANDARD OF REVIEW

A prisoner may not appeal the district court's denial of a petition for a writ of habeas corpus without first obtaining a COA. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). Where, as here, the district court did not grant a COA on any of Petitioner's claims, we have jurisdiction only to determine whether a COA should be granted. 28 U.S.C. § 2253(c)(1); *Miller-El*, 537 U.S. at 335–36.

No COA can issue unless the petitioner has "made a substantial showing of the denial of a constitutional right." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting 28 U.S.C. § 2253(c)(2)). To make such a showing, "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 472, 484 (2000)). In making this determination, we consider only "the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El,* 537 U.S. at 342.

6

"[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson,* 221 F.3d 741, 772 (5th Cir. 2000). Pursuant to § 2254(d), a prisoner in state custody is not entitled to federal habeas corpus relief unless the state court proceedings either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law . . . or; (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

## III.  DISCUSSION

Both of Petitioner's claims on appeal allege that his state trial counsel was ineffective, thus violating his rights under the Sixth and Fourteenth Amendments to the United States Constitution. These claims are governed by the two-prong test provided in *Strickland v. Washington*, 466 U.S. 668 (1984). *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008). Under the first prong, Petitioner bears the burden of showing that his "counsel's performance was deficient." *Id.* "[E]stablish[ing] deficient performance . . . [requires a] show[ing] that counsel's representation 'fell below an objective standard of reasonableness.'" *Id*. (quoting *Strickland*, 466 U.S. at 688). In evaluating this question, "we make every effort to eliminate the distorting effects of hindsight, and attempt to adopt the perspective of counsel at the time of the representation." *Id.* Further, we apply "a strong presumption that counsel's conduct falls within the range of reasonable professional assistance." *Id*. Under the second *Strickland* prong, Petitioner bears the burden of showing that "his counsel's deficient performance resulted in prejudice." *Id*. This requires demonstrating that but for counsel's deficient performance, "there is a reasonable probability that the outcome of the proceeding would have been different." *Id*.

No. 15-70007

**A. Whether Petitioner's trial counsel was ineffective for failing to adequately investigate, develop, and present mitigating evidence**

Petitioner contends that his trial counsel was ineffective for failing to develop and present the following mitigating evidence: (1) records from the North Carolina Department of Social Services ("NCDSS") showing Petitioner's dysfunctional family life; (2) school records showing that Petitioner suffered from a hearing impairment as a child; (3) the impact of the Laotian immigrant experience on Petitioner's upbringing; and (4) the failure of trial counsel to call Petitioner's family members to testify at the punishment stage of his trial.

On each of the grounds raised by Petitioner, the record does not reflect that his trial counsel's representation fell below the standard of diligence required. For instance, trial counsel requested NCDSS records in Petitioner's name and conducted an investigation into Petitioner's background and upbringing. This included conducting interviews with Petitioner's family members that uncovered the same information about his parents' harsh approach to child rearing that Petitioner claims were contained in the NCDSS records.

Petitioner's trial counsel also requested records from his school and collected information from Petitioner's family regarding Petitioner's hearing problems and the treatment he received. Further, the State provided Petitioner with grand jury testimony given by his sister that mentioned Petitioner's hearing issues. Given the fact that trial counsel had collected evidence of Petitioner's childhood hearing issues, counsel was not unreasonable for failing to locate the particular record Petitioner focuses on here. *See Moore v. Johnson*, 194 F.3d 586, 616 (5th Cir. 1999) ("Counsel is 'not required to pursue every path until it bears fruit or until all hope withers.'" (quoting *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980))).

8

No. 15-70007

Trial counsel was also aware of Petitioner's immigrant story. Petitioner's father, mother, and sister discussed their immigrant background at length in their interviews with Petitioner's trial counsel. Trial counsel reasonably chose not to present this information to the jury. As trial counsel stated, it was "clear that, as applied to [Petitioner's] life, it was not mitigating." Rather, trial counsel concluded that this information "could easily be seen as an aggravating factor," because it would highlight the fact that his siblings, who grew up in the same environment, "had avoided a life of violent gang involvement and violent crimes." This is precisely the type of strategic decision we have repeatedly said does not form the basis for a claim of ineffective assistance of counsel. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) ("[T]his Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir. 1996))).

The same is true of trial counsel's decision not to call Petitioner's family members to testify. Having made the strategic choice to focus their argument on convincing the jury that Petitioner should not be given the death penalty because he did not pose a future threat, trial counsel reasonably concluded that calling Petitioner's family members to the stand would have been detrimental to his case. Specifically, it was feared that permitting Petitioner's family members to testify would have invited the State to introduce evidence of his gang affiliations and his long history of violence. Additionally, at least one of Petitioner's family members—his mother—had expressed the opinion that Petitioner deserved to be put to death. As the state habeas court observed, in light of this risk, trial counsel reasonably concluded that calling his family members to testify would not have been in his best interest.

9

No. 15-70007

Petitioner has also failed to raise a debatable question that trial counsel's conduct caused him prejudice. As the state court noted, the evidence contained in the NCDSS records "was weak." Specifically, the records stated that Petitioner's sister had run away from home and made an allegation of abuse but that her allegation was determined to be "unsubstantiated." Further, Petitioner's trial counsel were aware of the allegations of abuse and nevertheless decided that it would not have offered convincing mitigation evidence.

The mitigation value of Petitioner's school hearing test records is weaker yet. While they showed that Petitioner suffered from some minor hearing problems as a child, these issues were resolved by the fifth grade when he was fitted for hearing aids. While Petitioner asserts that the outcome of his trial would have been different had the jury known about his hearing problems and the impact they had on his development as a child, he fails to explain how this would have been the case.

Petitioner has also failed to show that he was prejudiced from his trial counsel's decision not to introduce additional evidence about his family's immigrant story. First, in light of the fact that trial counsel did introduce this aspect of Petitioner's life story through his juvenile counselor, Petitioner has not shown what additional evidence should have been introduced or how it might have changed the outcome. Accordingly, Petitioner has not demonstrated that further evidence of this sort would not have been cumulative. *See Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992) (holding that no prejudice occurred where the unpresented evidence would have been cumulative of evidence already presented).

Second, on habeas review "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). That is, "it is necessary to consider *all* the

10

relevant evidence that the jury would have had before it if [counsel] had pursued the different path—not just the mitigation evidence [counsel] could have presented, but also the [negative] evidence that almost certainly would have come in with it." *Id.* at 20. As trial counsel observed, had they attempted to introduce further evidence of Petitioner's immigrant story, they ran the risk that this evidence would be aggravating rather than mitigating. As his trial counsel stated:

> As the investigation progressed, however, it became clear that, as applied to [Petitioner's] life, it was not mitigating. . . . The horrible immigration experience of [Petitioner's] father and mother was just that–an experience of his father and mother. [Petitioner] was born in the United States, and to my knowledge has never travelled outside the United States. [Petitioner] did not have those experiences himself. If his mother or father had been charged with a crime, it certainly would have been a factor of their background. Indeed the argument existed that he had been rescued by his parents from that experience, but in return he had not taken advantage of this opportunity by his decision to join gangs. This was in juxtaposition from the relatively productive lives his siblings had developed from the same parentage.

Finally, Petitioner has not shown that he was prejudiced by his trial counsel's decision not to call his family members to testify. Much like counsel's decision not to further advance Petitioner's family's immigrant story, counsel recognized the significant risk of allowing his family to testify. As one of his attorneys explained:

> [C]alling family members to testify would have allowed the State to introduce evidence concerning [Petitioner's] Asian gang history and gang affiliation. . . . Gang affiliation is a strong predictor of future violence. . . . It was decided that having family members corroborate this history would be extremely counterproductive to the assertion that [Petitioner] would not be a threat to anyone in prison.

Further, counsel worried that if called to the stand, Petitioner's own mother would opine that Petitioner deserved the death penalty rather than a life sentence: "On the whole it was believed that putting his mother on the stand, when she would say that in her opinion he deserved the death penalty, would not be in [Petitioner's] best interest."

This is precisely the type of "double edged" evidence we have previously said cannot form the basis for a claim of ineffective assistance of counsel. *See Boyle*, 93 F.3d at 188. In light of both "the good and the bad" calling his family members may have done, Petitioner has not shown that his counsel's decision caused him prejudice. *See Wong*, 558 U.S. at 20, 26.

For these reasons, Petitioner has not raised a debatable question as to whether the state court's decision denying his request for habeas relief was contrary to clearly established federal law or made an unreasonable determination of the facts. Accordingly, Petitioner's request for a COA as to this claim is denied.

**B.    Whether Petitioner's trial counsel was ineffective for failing to challenge that Walker's murder was committed in the course of a robbery**

Petitioner argues that the district court erred by failing to find that his trial counsel was ineffective for not challenging the allegation that he murdered Walker while committing a robbery. At trial, Petitioner's counsel made the decision to concede the robbery, stating: Petitioner "wanted to rob [Walker], and it didn't go the right way, and he killed her."

While Petitioner raised this issue as a sufficiency-of-the-evidence challenge on direct appeal before the state court, he failed to raise this issue on state habeas review. Accordingly, Petitioner has failed to exhaust this claim before the state courts. Under The Anti-Terrorism and Effective Death Penalty Act, but for two narrow exceptions that do not apply here, state prisoners

seeking a writ of habeas corpus are required to exhaust available state remedies. 28 U.S.C. § 2254(b)(1).

While Petitioner's failure to exhaust this claim generally would result in the dismissal of his petition, *see Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978), recently, the Supreme Court opened the possibility that an unexhausted claim of ineffective assistance of counsel could be considered for the first time on federal habeas review, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). As we explained in *Preyor v. Stephens*, 537 F. App'x 412 (5th Cir. 2013) *cert. denied,* 134 S. Ct. 2821 (2014):

> To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [Petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application.

*Id.* at 412 (second and third alterations in original) (citations omitted) (quoting *Martinez*, 132 S. Ct. at 1318). "[T]he petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013) (unpublished), *cert. denied,* 134 S. Ct. 1786 (2014).

Petitioner has neither argued nor shown that his state habeas counsel was ineffective. Accordingly, Petitioner has not overcome his burden of showing cause and prejudice for his failure to exhaust this claim before the state court and is barred from raising it here.

Even if Petitioner had established the ineffectiveness of his state habeas counsel, his effort would still fall short. While Petitioner argues he has shown that his ineffective-assistance-of-counsel claim based on the conduct of his trial

13

counsel has merit, his brief does little but disagree with trial counsel's strategy in light of the fact that it did not work. As the state court observed on direct appeal, there was more than enough evidence for the jury to find that Petitioner had committed the murder in the course of a robbery. *See Chanthakoummane*, 2010 WL 1696789, at *4. Specifically, the court noted that Walker had recently purchased a Rolex, bank surveillance video showed her wearing a watch and ring the morning of the murder, and when her body was discovered both the watch and ring were missing. *Id.* The court also noted that Petitioner had a motive to rob Walker as his bank account was overdrawn, his cell phone had recently been deactivated due to overdue bills, and that Petitioner had recently pawned certain goods. *See id.* Petitioner has not offered any convincing suggestion of how his trial counsel might have raised doubt on this issue.

Petitioner attempts to overcome these deficiencies by arguing that he should be excused from having to show the *Strickland* elements of deficient performance and prejudice because his case falls within the narrow exception recognized in *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court stated that in circumstances that "are so likely to prejudice the accused," *id.* at 558, "a presumption of prejudice is appropriate without inquiry into the actual conduct at trial," *id.* at 660. *Cronic*, however, limited this exception to the most serious of circumstances such as when there has been a "complete denial of counsel" or where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659. This is a far cry from Petitioner's trial. Petitioner was represented by two attorneys who conducted a thorough investigation, made informed strategic decisions about his defense, and called numerous witnesses on his behalf. While this strategy was ultimately unsuccessful, Petitioner's disagreement with it now does not

render it deficient, let alone so deficient as to bring it under the exception in *Cronic*.

Because Petitioner has failed to raise a debatable question as to the effectiveness of either his trial counsel or state habeas counsel, he has neither shown that we should consider his unexhausted claim nor that reasonable jurists could debate the merits of his underlying argument.

## IV.  CONCLUSION

For the foregoing reasons, Petitioner's application for a certificate of appealability is denied.