# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-30347
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

November 7, 2018

Lyle W. Cayce
Clerk

TROY RHODES,

     Petitioner - Appellee

v.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY,

     Respondent - Appellant

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-399

---

Before SMITH, WIENER, and WILLETT, Circuit Judges.

PER CURIAM:*

This appeal presents two questions: (1) whether Rhodes's trial counsel was constitutionally ineffective and (2) whether Rhodes made a sufficient showing of cause and prejudice to excuse the procedural default of his ineffective-assistance claim. We answer "yes" to both and affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30347

## I.    Factual and Procedural Background

In June 2004, a non-unanimous Louisiana jury convicted Petitioner-Appellee Troy Rhodes for the armed robbery and attempted second-degree murder of David Blohm, a delivery driver for a bakery, who was shot on June 19, 2002. When Blohm identified Rhodes as the shooter from a photo lineup on June 25, 2002—six days after he was shot and on the same day he had undergone major liver-repair surgery—Blohm "was under the influence of pain medication and the lingering effects of general anesthesia." At trial, the State relied almost exclusively on the testimony of Blohm, the victim and the sole eyewitness.

On cross-examination, Blohm denied that he was under the influence of any medication:

> Q: Okay. And when you make [sic] the identification of Troy Rhodes, obviously you were still in the hospital. Were you taking any pain medication at that time?
> A: I don't think I was, ma'am.
> Q: This would have been on the – on June 25, about six days, five days after the incident.
> A: No ma'am, I was not on anything at that time[.]
> Q: You were not on any pain medication at that time?
> A: (Witness shakes head negatively)

The prosecutors and Rhodes's trial counsel possessed Blohm's medical records documenting that he had received pain medication that day, but Rhodes's trial counsel did not use those records to impeach Blohm's statement.

Rhodes challenged the conviction in state court on several grounds. However, he did not assert an ineffective-assistance claim based on his trial counsel's failure to impeach Blohm's testimony until he filed a supplemental application in the state trial court after the Louisiana Supreme Court had stayed review of his original state-court application for postconviction relief. The state trial court did not consider the ineffective-assistance claim, and

No. 18-30347

instead denied the supplemental application as untimely and repetitive under articles 930.4 and 930.8 of the Louisiana Code of Criminal Procedure. The state court of appeal affirmed, and the Louisiana Supreme Court denied relief without opinion. Rhodes then petitioned for a writ of habeas corpus in federal court in 2011, reasserting the ineffective-assistance claim—which the state court had denied as repetitive and untimely—based on his trial counsel's failure to impeach Blohm's testimony with Blohm's medical records.

The district court stayed the federal proceedings pending the resolution of additional proceedings in state court, and, after Rhodes exhausted his state-court remedies, reopened the federal case.[1] The district court referred the case to a magistrate judge, and, in July 2013, the magistrate judge issued a Report and Recommendation concluding that (1) Rhodes's ineffective-assistance claim was procedurally defaulted based on adequate, independent state-law grounds, and (2) Rhodes had not made a sufficient showing of cause, prejudice, or a fundamental miscarriage of justice to avoid the procedural bar. The district court vacated the magistrate judge's Report and Recommendation based on Rhodes's subsequent motion to amend his petition to account for the then-recent United States Supreme Court decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). The district court referred the case to the magistrate judge for a second Report and Recommendation. This time the magistrate judge recommended that the petition be dismissed with prejudice.

Rhodes objected to the second Report and Recommendation, but the district court adopted the recommendation that Rhodes's ineffective-assistance

---

[1] Two district court decisions are on appeal: (1) the March 8, 2018 Order and Reasons, and (2) the September 19, 2014 Order and Reasons. The factual and procedural background of the federal proceedings is set out in detail in those orders, so only a summary is necessary here.

No. 18-30347

claim was procedurally defaulted based on articles 930.4 and 930.8 of the Louisiana Code of Criminal Procedure. However, the district court rejected the recommendation that Rhodes had not made a sufficient showing of cause and prejudice to overcome the procedural bar. Instead, that court held that Rhodes's trial counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). It also held that under the second prong of the *Martinez* exception to procedural default—ineffective assistance of postconviction counsel—the record confirmed that Rhodes's postconviction counsel "at no time requested to inspect or see trial counsel's file," but that "more information" was needed to resolve Rhodes's claim that his postconviction counsel was ineffective.

The case was reassigned to a different district judge in January 2016. The parties submitted supplemental briefing on whether Rhodes's postconviction counsel was ineffective, which would excuse the procedural default. The district court held that the procedural default was excused because Rhodes had established cause and prejudice based on his postconviction counsel's failure to request Rhodes's trial counsel's records. The court granted Rhodes's petition, set aside his sentence, and ordered his release unless the State granted a new trial within 120 days. Warden Vannoy timely appealed.

## II. ANALYSIS

### A. Ineffective Assistance of Trial Counsel

"Ineffective assistance of counsel is a mixed question of law and fact which we review *de novo*."[2] The legal standard for Rhodes's ineffective-assistance claim "is the familiar one derived from *Strickland*: the petitioner must show both that his 'counsel's representation fell below an objective

---

[2] *Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996).

standard of reasonableness' and that this deficiency prejudiced him."[3] "An error is prejudicial if it results in 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[4] It is Rhodes's burden to establish prejudice.[5]

On the first prong, deficient performance of trial counsel, the original district judge held that Rhodes's trial counsel's performance fell below an objective standard of reasonableness because, despite having Blohm's medical records, "counsel offered no real challenge to [Blohm's] testimony." The court rejected the State's argument that this failure was a tactical decision, concluding instead that such a "grievous omission" could not accurately be described as sound trial strategy, and that "even according substantial deference to counsel's decision-making," Rhodes had established deficient performance.

On the second prong, prejudice, the district court evaluated the evidence presented at trial and concluded that Rhodes's trial counsel's failure to impeach Blohm created a reasonable probability of a different outcome at trial. The court pointed out many inconsistencies with the other evidence presented at trial, including that: (1) no physical evidence connected Rhodes to the crime scene; (2) none of the fingerprints taken at the scene matched Rhodes's; (3) another witness, Basem Abed, testified that he had seen Rhodes at the A&D Food Store 45 minutes before the shooting, but did not see him during or after the shooting; (4) Rhodes was a regular customer of the store and came in almost every day; (5) no fingerprints were taken from the shotgun that was allegedly used to commit the crime; (6) law enforcement failed to connect

---

[3] *Thomas v. Vannoy*, 898 F.3d 561, 572 (5th Cir. 2018) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

[4] *Id.* (quoting *Strickland*, 466 U.S. at 694).

[5] *Id.*

No. 18-30347

Rhodes to the residence at which the shotgun was found and did not question any of the residents of the house, "who could just as easily have used the gun" to commit the crime; (7) the search of Rhodes's house recovered "no meaningful evidence" of his involvement; (8) although police had two other suspects, they were placed in a photo lineup only once and were not included in subsequent lineups; (9) Blohm gave varying descriptions of the crime and the weapon, and his initial statements to the police were inconsistent with his trial testimony; (10) there were problems with the identification process, including (a) inconsistencies in the descriptions of the perpetrator's complexion (Blohm initially reported that the perpetrator had a "dark complexion," but two days later described "light brown skin"), (b) age (anonymous 911 callers initially described the perpetrator as a teenager), and (c) a lack of specific, identifiable characteristics (Blohm never described Rhodes's "seemingly distinctive" gold teeth); and (11) testimony that Blohm had recognized Rhodes as a regular customer of the store before identifying him as the shooter.

In addition to noting those inconsistencies that show that the evidence supporting guilt "was already severely compromised in several respects," the court thoroughly analyzed the medical records and concluded that they would have undermined Blohm's credibility and served as valuable impeachment evidence. The court observed that a "rational jury would have had concerns about whether the victim, who had never described the perpetrator's face, had accidentally picked out a vaguely familiar one in an overly eager attempt to hold someone responsible for this heinous crime."

The district court held that Rhodes had established deficient performance and prejudice, making his trial counsel constitutionally ineffective. We agree and affirm.

6

## B.    The District Court's Factual Findings

Warden Vannoy's primary argument is that the original district judge's finding that Blohm's medical records showed that he was medicated when he identified Rhodes is clearly erroneous. That judge made the following findings:

> Having reviewed the records in question, the Court finds that they do in fact impeach or rebut this testimony.
>
> The record confirms that the victim was admitted to Charity Hospital on June 19, 2002 following this incident and transferred to Slidell Medical on June 25, 2002. During that time, the victim appears to have had at least 3 surgeries. Further, according to the Operative Report from June 25, 2002, the victim received major surgery to repair his liver on June 24 and 25. While the Operative Report does not say when on June 25 this surgery took place, the records contain a Doctor's Order form signed June 25, 2002 at 6:45 AM, which indicates "transfer from SICU to LSU Surgery." According to the police report, the victim identified petitioner at Charity hospital in a photo-array at 5:52 P.M.
>
> . . .
>
> What these records ultimately reflect is that petitioner was given a prescription for oral acetaminophen/oxycodone (Percocet) every 4 to 6 hours and intravenous morphine sulfate injections every 2 hours, both as needed to relieve pain from June 22, 2002 until June 25, 2002, and further intravenous Promethazine HCL as needed to relieve pain from June 22, 2002 until July 22, 2002. These records indicate when each medication is administered and show certain gaps in administration. Nevertheless, the victim was on a continuous dose of one or more of his pain medications from at least June 23 to June 24.
>
> Although petitioner has not presented any Medication Administration form from June 25, 2002, this absence is not fatal to his claim. Other records persuasively indicate that the victim was at least taking morphine when he identified petitioner from the array on June 25 at 5:52 P.M. First, petitioner has presented a "Fall Risk Assessment" form, completed for the victim by Charity Hospital medical staff, which shows that the victim received the

No. 18-30347

same medication sub-score for each day he was hospitalized at Charity - 6 for "Schedule II, III, IV drugs PRN." Although "PRN" means "as needed," it makes sense, given the apparent purpose of this form, that the score corresponds to medication actually administered.

Second and most importantly, the petitioner has presented the victim's Doctor's Order forms for June 19 to 25, 2002. Like the aforementioned Medication Administration records, the June 22 Doctor's Order form shows that the victim was prescribed 2 to 4 mg of intravenous morphine sulfate every two hours "PRN" or "as needed" for breakthrough pain. The June 25 Doctor's Order that mentions the victim's transfer to surgery also contains a prescription for intravenous morphine sulfate injections every two hours, except there is no "PRN" designation. Notably, the victim's Percocet prescription retained its PRN designation even in the June 25 Doctor's Order form. Thus, it appears that beginning whenever the victim was transferred to surgery, morphine sulfate was no longer being administered on an "as needed" basis. The need for the drug had been predetermined by the physician, based on the surgery.

As petitioner has argued, for other non-PRN drugs, the Doctor's Order form expressly indicates when, for some reason, the drug is not administered. No such indication is given for the morphine sulfate after June 25, Thus, the records show that on June 25, in addition to having general endotracheal anesthesia at some point before major surgery on his liver, the victim was being administered morphine sulfate injections regularly at 2-hour intervals.

As to when these injections stopped, the record is somewhat confusing. On the one hand, there is a Doctor's Order form captioned "Transfer to Slidell Memorial," indicating new prescriptions that do not include morphine; this form is signed and dated June 25 at 3:46 P.M. Assuming the victim's last injection as given around 3:45 p.m., the effects of the drug would have been just wearing off around 5:52 P.M. when the victim identified petitioner. However, this record does not contain the 12 and 24 hour "chart" checks that the other Doctor's Order forms have. These checks only appear on the original June 25 Doctor's Order

8

form that lists the morphine prescription, suggesting that it continued to remain in force within Charity Hospital, until the victim transferred to Slidell Medical. The checks last until June 26, 2002 at 8:25 A.M., when it appears that the victim was actually transferred - the last entry on the record is "copy chart for transfer." Thus the form dated June 25 at 3:46 P.M. appears to state the victim's post-transfer prescriptions. The morphine injections themselves lasted up until the time of transfer on the morning of June 26.

Warden Vannoy contends that these findings fail to account for the medical definition of "breakthrough pain," which does not refer to persistent pain expected to follow surgery, but rather refers to "clinical circumstances wherein patients who have controlled baseline pain experience severe episodes of pain that breaks through the medical therapy (usually opioids) that has relieved the baseline pain."[6] According to the Warden, the June 25, 2002 morphine prescription for breakthrough pain does not establish that Blohm was under the influence of morphine when he identified Rhodes as the shooter because it does not indicate that Blohm was experiencing "breakthrough" pain. Warden Vannoy also contends that the "Falls Risk Assessment" does not support the district court's conclusions because that assessment established only that Blohm was *prescribed* morphine and that morphine *was available* to him, but does not establish that morphine was *actually administered.*

"[W]e review findings of fact for clear error . . . ."[7] The district court did not clearly err in finding that Blohm was under the influence of medication on June 25, 2002 when he identified Rhodes. After being shot on June 19, Blohm underwent three surgeries, one on June 19, another on June 24, and the third on the morning of June 25. While Blohm was still in the hospital, he identified

---

[6] *See* PERRY FINE, THE DIAGNOSIS AND TREATMENT OF BREAKTHROUGH PAIN 1 (Oxford Univ. Press 2008).

[7] *Cannon v. Johnson*, 134 F.3d 683, 686 (5th Cir. 1998).

Rhodes in a photo lineup. That was at 5:52 PM on June 25. A review of the medical records and the record on appeal supports the district court's conclusion that Blohm was under the influence of morphine or the lingering effects of anesthesia following surgery earlier in the day. Additionally, and contrary to Warden Vannoy's contention, the fact that Blohm was prescribed morphine for breakthrough pain after undergoing major liver-repair surgery leads to a reasonable inference either that morphine was actually administered for pain after that surgery or that the prescribing doctor ordered Percocet for breakthrough pain after determining that Blohm was experiencing such pain. Finally, even if Blohm were not in fact under the influence of morphine when he identified Rhodes on June 25, 2002, the medical records showing that he had been *prescribed* morphine twice on that day, with one prescription for Percocet at 3:46 PM, approximately two hours before he identified Rhodes, would have critically impeached Blohm's categorical denial that he was taking pain medication. The district court's factual findings on this issue were not clearly erroneous.

## C.    Trial Strategy

Warden Vannoy next contends that, because of the complex nature of the medical records at issue, Rhodes's trial counsel would have had to call a medical expert to effectively impeach Blohm's testimony. According to Warden Vannoy, the complicated notations, such as "Percocet . . . tab po q4-8 prn for pain," would not have been effective to impeach Blohm and would have been confusing to the jury.

As the district court explained, Rhodes's trial counsel's decision to ask the witness about pain medications, but without using the available medical records to impeach him, "resulted in a situation where [Blohm] was allowed to falsely bolster the credibility of the identification with impunity." Rhodes's counsel also "failed to even mention that the victim had been in surgery the

same day as the identification, a fact that she had brought out in the [earlier] probable cause hearing." We agree with the district court's conclusion that the record does not support a conclusion that Rhodes's counsel might have been tactically limiting the scope of her cross-examination, and that her failures "cannot be accurately described as 'sound trial strategy.'"

## D.    Prejudice

Considering (1) the State's reliance at trial on Blohm's identification of Rhodes, (2) the second district judge's determination that Rhodes was "convicted almost entirely on the basis of" Blohm's identification, and (3) the inconsistencies in the other evidence presented at trial, Rhodes's counsel's failure to impeach Blohm with the available contrary medical records prejudiced Rhodes. We conclude that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[8]

## E.    Procedural Default

The next question is whether the procedural default of Rhodes's claim of ineffective assistance of trial counsel is excusable. "We review the district court's [or grant] of federal habeas relief based on a state procedural ground *de novo*."[9]

Under *Martinez* and *Trevino*, to establish "cause" to excuse a procedural default, a petitioner must show that "(1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and

---

[8] *Thomas*, 898 F.3d at 572 (quoting *Strickland*, 466 U.S. at 694).
[9] *Pitts v. Anderson*, 122 F.3d 275, 278 (5th Cir. 1997).

No. 18-30347

(4) state law requires that an 'ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.'"[10] In this case, prongs one and four are satisfied because Rhodes's trial counsel was constitutionally ineffective. Prong three is satisfied by this court's conclusion that the *Martinez*/*Trevino* rule applies in Louisiana.[11] The only remaining issue is whether Rhodes has established the presence of prong two, *viz.*, that his postconviction counsel was constitutionally ineffective in failing to obtain Blohm's medical records.

The facts relating to this issue are undisputed, summarized by the district court as follows:

> Kevin Boshea represented [Rhodes] in his application for post-conviction relief. In that application, Boshea asserted claims of ineffective assistance of counsel based on trial counsel's failure to lodge certain objections, but did not assert a claim based on trial counsel's failure to impeach the victim with the victim's medical records because Boshea never saw the records in question. Boshea admits that, had he seen the records indicating that the victim identified [Rhodes] while under the influence of powerful medication, he would have asserted a claim of ineffective assistance of trial counsel for failure to impeach.

> At the time that Boshea was preparing [Rhodes's] post-conviction application, the victim's medical records existed in at least two places: the complete file of [Rhodes's] trial attorney housed by the public defender, and the files of the hospitals at which the victim was treated. Boshea never made any request to the hospitals for the records. Boshea did make a request to the chief public defender for the file of [Rhodes's] trial counsel. On April 23, 2007, Boshea received a file from the defender's office with a letter stating that the file was complete. Boshea could tell, however, that the file was not complete. Boshea states by affidavit that, at that time, he "considered it a reasonable possibility that

---

[10] *United States v. Trevino*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. 1, 13–18 (2012)).

[11] *See Coleman v. Goodwin*, 833 F.3d 537, 543 (5th Cir. 2016).

portions of [trial counsel's] file may have been lost or destroyed by Hurricane Katrina," and that he "did not consider it likely that additional requests to the public defender's office . . . would have resulted in the discovery of additional material." This assumption was never confirmed, however, as Boshea never contacted the public defender's office again.

On November 30, 2007, the state court held an evidentiary hearing on [Rhodes's] bare-bones post-conviction application. [Rhodes's] trial counsel was called to testify. She testified that the copy of her trial file that Boshea possessed represented only "one tenth of [her] case file," and was missing "the initial police report; the supplemental police reports; the witness identification; that is the photographic lineups; the records from the hospital regarding the alleged victim's injuries[; and] all my notes from the several hearings that were held in this matter." Trial counsel also said that she had turned her complete file over to the public defender's office.

At the conclusion of the evidentiary hearing, Boshea requested that the office of the district attorney provide him with its file in the matter and that the hearing remain open pending that file's delivery. The state did not object, but did not have the file in court that day. On March 24, 2008, the district attorney's custodian of records notified Daniel Pipes, the assistant district attorney assigned to the matter, that the file could not be located. Mr. Pipes relayed that information to Boshea at some point before Boshea submitted petitioner's application to the state court for final consideration. The state trial court denied [Rhodes's] application for post-conviction relief from the bench following oral argument on April 22, 2008.

Boshea made a second request to the district attorney's office for the file on November 14, 2008, but was told again that it could not be located.

On July 6, 2009, responding to a *pro se* request by [Rhodes], the public defender's office located the remainder of the trial file and delivered it to [Rhodes]. The public defender's office does not offer an explanation for why the complete file was not delivered the first time. However, Stephen Singer, who worked at the office in senior roles from 2006 to 2009, states by affidavit that the files

were not damaged in Hurricane Katrina and were not reorganized between the requests for the file by Boshea and [Rhodes] himself. He further opines that, had Boshea asked again for the complete file, the office would have been able to find it.

The district court held that Boshea's investigation, which consisted of one request to the public defender and one to the district attorney, was unreasonable, especially considering that Boshea knew that a significant portion of the file was missing but failed to search further. The deficient investigation prejudiced Rhodes because it prevented him from timely asserting his meritorious ineffective-assistance claim in state court.

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[12] Boshea had an obligation to "explore all avenues leading to facts relevant to the merits of the case."[13]

Even though the file Boshea reviewed contained a letter from the public defender's office stating that it was complete, Boshea knew that the file was not complete. Despite that knowledge, Boshea never followed up with the public defender's office or took any steps to obtain Blohm's medical records from the hospital. Given the importance of trial counsel's complete file, Boshea's failure to investigate further and to obtain that file was objectively unreasonable. For the reasons stated in detail by the district court, Boshea's failure to investigate was unreasonable, prejudiced Rhodes, and therefore was constitutionally ineffective.

---

[12] *Wiggins v. Smith*, 539 U.S. 510, 526 (2003).
[13] STANDARDS FOR CRIMINAL JUSTICE § 4-4.1 (AM. BAR ASS'N 1993).

No. 18-30347

### III.    Conclusion

Rhodes has established that his trial counsel and postconviction counsel were constitutionally ineffective. Under *Martinez* and *Trevino*, that excuses the procedural default of his ineffective-assistance claim. Rhodes is therefore entitled to a writ of habeas corpus.

AFFIRMED.